UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

UNITED STATES OF AMERICA,

                              CRIM. NO. 14-50 (NLH)

    v.                       OPINION (Filed Under
                                 Temporary Seal)

MALIK DERRY AND MYKAL DERRY,

    Defendants.

_____

APPEARANCES:

WILLIAM E. FITZPATRICK
ACTING U.S. ATTORNEY

PATRICK C. ASKIN
EDMUND MALLQUI-BURGOS
NORMAN JOEL GROSS
JUSTIN C DANILEWITZ
ASSISTANT U.S. ATTORNEYS

UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF NEW JERSEY
CAMDEN FEDERAL BUILDING & U.S. COURTHOUSE
4TH FLOOR
P.O. BOX 2098
401 MARKET STREET
CAMDEN, NJ  08101-2098
    On behalf of the United States of America

JOSHUA MARKOWITZ, ESQ.
3131 PRINCETON PIKE
BLDG. 3D SUITE 200
LAWRENCEVILLE, NJ  08648
    On behalf of Defendant Malik Derry

R. EMMETT MADDEN, ESQ.
711 WEST AVENUE
JENKINTOWN, PA  19046
    On behalf of Defendant Mykal Derry

<u>HILLMAN</u>, District Judge

Pursuant to Federal Rule of Criminal Procedure 37,
Defendant Malik Derry seeks an indicative ruling from this Court
that it would grant a motion to vacate his conviction and
sentence under 18 U.S.C. § 924(c) if the Court of Appeals were
to remand this case for that purpose.  The Defendant contends
that the government violated its obligations of disclosure under
the rule set forth in <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).[1]
The United States requests that we deny the motion.[2]  For the

---

[1] The parties disagree as to the proper relief should the
Court determine a <u>Brady</u> violation occurred.  Since we find no
violation, we need not address the scope of any remedy.  Also
before the Court are motions by co-Defendant Mykal Derry to join
in Malik Derry's motion and brief.  We will grant those motions.

[2] Technically, the Government has asked the Court to issue
an indicative ruling that it would deny the Defendant's motion
rather than simply and directly deny the motion on the merits.
For the reasons explained by this Court at a July 17, 2017
hearing, the Court does not believe that the plain text of Rule
37 allows for the former option. (Tr. of July 17, 2017 Hearing,
Docket No. 922.)  Nor, in this Court's opinion, does such an
option make sense in light of the intended purpose of Rule 37.
Absent Rule 37, the filing of an appeal ordinarily divests the
district court of jurisdiction during the appeal.  However,
denying a defendant's post-trial motion for a new trial or
similar relief simply reiterates from the perspective of the
district court that the proceedings before that court are over.
Arguably then, the denial of the motion does not disrupt the
appellate process and does not prejudice the parties, allowing,
at worse, the defendant another issue for timely appeal or an
expansion of the record above.  On the other hand, granting a
defendant's motion for post-trial relief while a defendant's
appeal is pending could moot an appeal, frustrate the orderly
administration of the appellate process, and waste the time and
resources of the appellate court.  Accordingly, in granting the
district courts limited jurisdiction to hear post-trial motions

reasons set forth below, we will deny the motion to vacate the conviction and sentence pursuant to Fed. R. Crim. P. 37(a)(2).

## I.

### INTRODUCTION

This Rule 37 motion follows the trial and conviction of brothers Mykal Derry and Malik Derry, indicted by the Government on a multitude of charges related to a heroin trafficking conspiracy. One of the charges, Count Ten, alleged that they "did knowingly and intentionally use, carry, possess, brandish and discharge a firearm in furtherance of the drug trafficking crime." (Superseding Indictment, Docket No. 194.)

The evidence introduced at trial to convict Malik Derry of Count Ten related primarily, but not exclusively, to one event, the shooting and murder of Tyquinn "T.Y." James. The Government's theory was that Malik Derry, as an enforcer for the Derry Drug Trafficking Organization ("DDTO"), shot and killed James, a rival drug dealer, in cold blood, because James dared to appear near territory claimed by the DDTO.

---

after the filing of an appeal, the drafters of Rule 37 appear to have intended that if the motion has merit the district court may merely "indicate" an intention to grant rather than conveying a power to grant the motion. This leaves to the appellate court in each instance – either denying or, in the alternative, indicating an intention to grant - the final word on what further proceedings below are appropriate.

The jury was shown a video of the murder captured by a surveillance camera focused on the area in front of the storefronts where the shooting occurred. James, on foot and lingering in front of one of the stores, is approached from behind by a tall, thin, hooded figure on a bicycle who shoots him in the back of the head, execution-style, with a handgun. James slumps over lifeless. The cyclist rides on, appearing to take the time to shoot at least one more round at James on the ground.

In addition to the video, the Government's case was based upon evidence including wiretaps of telephone calls and text messages between the Derry brothers and others before and after the shooting, the recovery of a bicycle and the murder weapon from Mykal Derry's part-time residence, in addition to other evidence that the DDTO used violence, including training with and using guns, to protect its turf and its members.

In response to this evidence and the government's theory that Malik Derry shot James in furtherance of the operations of the DDTO, Mykal Derry took the witness stand in his own defense (and in de facto defense of his brother) and on cross-examination offered his confession that he - not his younger half-brother Malik - shot James. Mykal told the jury that he shot and killed James in retaliation for shots fired at him on an earlier date, arising from a dispute over a woman about whose

name he was vague.[3] (Trial Tr. 5559, August 11, 2015, Docket No.

816) (Cross-examination of Defendant Mykal Derry: "I think her

name was Tasha. I don't -- it was back in 2011. I ----.")

As discussed more fully below, the jury plainly rejected

Mykal's confession and, although they were not called upon to

answer precisely the question of whether Malik Derry shot James,

they returned a verdict that demonstrated they accepted both the

Government's theory that Malik, not Mykal, pulled the trigger

---

[3] Mykal Derry's confession is remarkable given the fact that both he and his brother were, and as of this date are, facing state murder charges for the murder of James, raising the specter that his confession under oath would be used against him. In some circumstances, federal law and its state analogs recognize that confessions may take on an aura of reliability or are otherwise admissible. See e.g., Fed. R. Evid. 804(b)(3) (creating a hearsay exception for statements against penal interests when a declarant is unavailable) and Fed. R. Evid. 801(d)(2)(categorizing as non-hearsay an admission by a party-opponent). The risk to Mykal Derry of a decision to confess is, in fact, more nuanced and much more attenuated than might first meet the eye. The Government does not believe his confession and presumably the state prosecutors will not offer a false confession to the murder of James in state court, at least not for the truth, when the overwhelming evidence – regardless of why James was shot – proves that Malik committed the murder. If the jury believed Mykal's confession, both he and his brother would have been acquitted of the 924(c) charge which carried a mandatory consecutive sentence of 10 years, would have avoided certain sentencing enhancements under the drug conspiracy charge, and his brother's exposure to the state charges might be eliminated or diminished. Given the practical limitations of the use of his confession in state court, if the jury disbelieved the confession the ramifications for future proceedings were minimal. In colloquial terms, if false, Mykal's confession was all upside and no downside. As noted elsewhere in this Opinion, whatever Mykal Derry's motives or calculus might have been, the jury rejected the confession.

and the overwhelming evidence that Malik shot James to protect the Mykal Derry-led DDTO and its lucrative heroin sales in the Atlantic City housing project they controlled.

The Defendants argue they should be granted an acquittal or other lesser relief on the Count Ten charge because they say the Government failed to disclose <u>Brady</u> information they would have used to impeach a Government cooperator, Kareem Young, whose testimony they argue was the Government's only evidence linking the shooting to the drug trafficking crime.

## II.

### PROCEDURAL HISTORY

#### A. Trial and Sentencing

Malik Derry and Mykal Derry were two of 34 defendants charged on March 18, 2013 by criminal complaint with conspiracy to distribute heroin. (Complaint, Docket No. 1.) On March 26, 2013, Mykal and Malik Derry were arrested. (Arrest Warrant, Docket No. 6.) On February 5, 2014, 15 alleged co-conspirators were indicted together (Indictment, Docket No. 45) and subsequently arraigned.[4] The matter was designated as a complex case[5] and after a series of guilty pleas, two trials of the

---

[4] Most, if not all, of the other defendants named in the original complaint either pled guilty to informations filed pursuant to plea agreements or were indicted in separate cases.

[5] The Government summarized the complexity of the case in a March 11, 2014 motion: "Two judges - including this Court - have

remaining defendants were held.  Five defendants were tried

together before the late Senior United States District Judge

Joseph E. Irenas.  Beginning on July 7, 2015, the last of the

defendants, Mykal Derry and Malik Derry, proceeded to trial

before the undersigned.  On August 18, 2015, the jury convicted

Malik Derry on all counts of the Superseding Indictment (Docket

No. 194), except one, and Mykal Derry on all counts, except one.

(Verdict Sheet, Docket No. 827.)

More specifically, the jury convicted Mykal and Malik Derry

both of: (1) conspiring to distribute one or more kilograms of

heroin; (2) using, carrying, or possessing a firearm during and

in furtherance of that conspiracy; and (3) discharging a firearm

in furtherance of that conspiracy.  In addition, the jury

convicted Mykal Derry of 41 counts of using a telephone in

furtherance of a drug-trafficking crime and in eight of those

counts convicted Malik Derry of the same charge. (Id.)  The jury

---

now concluded this case is complex.  The reasons for these
independent conclusions are not disputed: this case involves a
long-running and violent drug conspiracy including close to
three dozen co-conspirators; it involves voluminous evidence,
including thousands of hours of wiretap intercepts of 7 cellular
telephones recorded over a 6-month period [], as well as text
messages, surveillance photographs and video recordings, law
enforcement recordings, search warrant evidence; and by the time
of trial; will also include the Government's use of numerous law
enforcement witnesses, cooperator testimony, expert testimony,
and the introduction of firearms drug laboratory and other
physical evidence." (Memorandum in Support of United States
Motion for Complex Case Designation and Continuation of Time
under the Speedy Trial Act, Docket No. 104-1 at 2.)

also convicted Mykal Derry separately of distributing smaller amounts of heroin and operating a stash house. (Id.)

In an example of the jury's discerning nature and attention to detail, it acquitted Mykal Derry of distributing, or possessing with intent to distribute, a distributable amount of heroin on October 18, 2012 in Count 5 but convicted him of aiding and abetting the same distribution.  The jury's attention to the evidence in the case is also apparent in its decision to convict Mykal Derry of brandishing a firearm in furtherance of the drug conspiracy but acquitting Malik Derry of the same charge.  We discuss the apparent ramifications of that detailed verdict as it relates to the alleged Brady violations below.

On January 7, 2016, this Court sentenced Mykal Derry to a total term of life imprisonment plus a consecutive prison term of 120 months, and twenty years of supervised release. (Mykal Derry Sentencing Judgment, Docket No. 848.)  On August 19, 2016, this Court sentenced Malik Derry to "life imprisonment plus a consecutive prison term of 120 months, and ten years of supervised release." (Malik Derry Sentencing Judgment, Docket No. 885.)

## B.  Initial Brady Issue: The Brown I FD 302

Following the jury verdict, but prior to sentencing, Malik Derry wrote a letter to this Court describing a communication he

had with Jodi Brown, a co-conspirator.[6]  In that letter,

Defendant stated that after the trial had ended, Brown, an

admitted member of the DDTO, had "mentioned that she made

statements concerning the [murder of James] which implies guilt

but with an alternative version that the Government alleges in

the indictment."  In the letter, Malik Derry also wrote that he

had been frustrated in his efforts to get the Brown interview

materials and suggested the possibility of an *in camera*

inspection.  On May 23, 2016, this Court conveyed to counsel for

the Derrys and the Government a copy of that undated letter

assuming the statements referred to were statements made to law

enforcement.

Brown's October 28, 2014 FBI interview, following standard

procedure, was documented on a Form FD 302 ("302" or "FD 302").

("Brown I 302," Docket No. 903-3.)  This Court determined that

while the Government had intended to send the Brown I 302 to the

defense during trial, it inadvertently had not. (Tr. of August

19, 2016 Hearing ("August Hearing"), Docket No. 893 at 17-18.)

Instead, in the midst of trial, and prior to the close of the

defense case, one of the prosecutors sent an email dated July

26, 2015, at 4:31 p.m. (Docket No. 873-4) conveying a summary of

---

[6] At times, Brown's first name is spelled "Jodie." (United
States v. Jodie Brown, Crim. No. 14-162 (D.N.J.).)

the prosecutor's notes from the interview. (Tr. of June 17, 2016 Hearing ("June Hearing"), Docket No. 878 at 28, 32-33.)

In the post-trial June 2016 Hearing, Malik Derry argued the Government's failure to disclose the actual 302 constituted a Brady violation. At that hearing, the Court denied the Brady motion in part, holding that the email summary provided timely disclosure of Brown's statement that she lacked any knowledge of the reason Tyquinn James was murdered and was disclosed in a manner that allowed that information to be utilized by the defense, if they had chosen, at trial. (Docket No. 878 at 45.) Malik Derry moved for an Order granting a Judgment of Acquittal pursuant to a Brady violation. (Defendant's Brady Motion, Docket No. 873.)

In an August 19, 2016 oral opinion, this Court denied the Brady motion in full, concluding: "To the extent that there was anything in the 302 that was material, that was exculpatory and material, it was not suppressed, it was disclosed [by virtue of the email summary]. To the extent that any additional materials in the 302 were not disclosed, they were neither exculpatory nor ultimately material in this matter." (Docket No. 893 at 19.) The Court then proceeded to sentencing. (Minute Entry, Docket No. 884.)

## C. **Subsequent Brady Issues**

In September 2016, when preparing for the sentencing of a co-conspirator, Ambrin Qureshi, the Government discovered an FBI Form FD 302 summarizing an FBI interview with Qureshi ("Qureshi I 302," Docket No. 903-2) in which, like Brown, Qureshi denied having any knowledge as to why Tyquinn James was murdered. On November 14, 2016, the Qureshi 302 was disclosed to Defense counsel. (Letter Supplemental Brief of Defendant, Motion for Indicative Ruling, Docket No. 911 at 3-4.) The Government also provided a copy of a 302 of a post-trial September 2016 interview of Qureshi ("Qureshi II 302"). (Docket No. 903-1.)

Both Defendants appealed their convictions and the cases were consolidated by the Court of Appeals. On December 7, 2016, Malik Derry filed a motion in the Court of Appeals, asking to include the Qureshi I and II 302s in the record. By Order of December 13, 2016, following the motion of Malik Derry, the Court of Appeals stayed the briefing and resolution of Derry's motion to expand the record pending an indicative ruling by this Court.[7] In its Rule 37 motion, Defendant requested that this Court consider the "newly discovered" evidence, the Qureshi 302s, in the context of Defendant's prior Brady motion involving

---

[7] On December 27, 2016, the Court of Appeals granted Mykal Derry's motion to join Malik Derry's stay motion.

Brown. (Defendant's Motion for an Indicative Ruling, Docket No. 903 at 14.)

After the Rule 37 motion was filed, the Government reviewed all of the 302s of the other co-conspirators who proffered information to the Government. "In an abundance of caution, and not because the Government believed it was obliged to do so," the Government disclosed two additional 302s regarding interviews of Franklin Simms ("Simms 302") and Laquay Spence ("Spence 302").[8]

In his supplemental briefs in support of his Rule 37 motion, Defendant asks the Court to find <u>Brady</u> violations as to the Brown, Qureshi, and Spence 302s.[9] (Letter Supplemental Brief

---

[8] Because the Government was concerned about the "threats against and intimidation of witnesses that have occurred in the case," the 302s were to be turned over once the parties finalized an "attorneys eyes only" agreement. On December 30, 2016, the Government turned over the November 2013 pretrial interview of Laquay Spence and the March 2016 post-trial interview of Franklin Simms. (Docket No. 911-3 (Spence) and 911-4(Simms).) Because of the confidential manner in which the full 302s were disclosed to the defense, and because this Opinion references or quotes such 302s in part, the Court will initially order this Opinion sealed for a period of ten days in an exercise of caution. If no application for redaction is made within those ten days, the full Opinion will be filed on the docket. While not absolute, a strong presumption of openness and public disclosure applies in judicial proceedings especially criminal matters. <u>Press-Enterprise Co. v. Superior Court of California, Riverside County</u>, 478 U.S. 1 (1986). The parties may jointly move to unseal the full opinion at any time before the ten day period expires.

[9] Defendant concedes that the Simms 302 does not contain <u>Brady</u> material. (Docket No. 911 at 4 n.1.)

of Defendant, Motion for Indicative Ruling, Docket No. 911 and Letter Reply Brief of Defendant, Motion for Indicative Ruling, Docket No. 914.) Malik Derry argues he is entitled to an "acquittal of his convictions" (Docket No. 911 at 1) or in later briefing, "complete judgment of acquittal, a judgment of acquittal on the 924(c) count or a new trial pursuant to Fed. R. Crim. P. 33[]" (Docket No. 914 at 20).

The Government argues the three 302s at issue are not <u>Brady</u> material and therefore Defendant is entitled neither to an acquittal nor a new trial. (Gov. Response to Defendant's Motion for an Indicative Ruling, "Response Brief," Docket No. 913 at 55.)[10] At the July 17, 2017 hearing on the pending motions, the United States asked the Court to deny the Defendant's motion in full. (Tr. of July 17, 2017 Hearing, Docket No. 922.)

### III.

### JURISDICTION

Rule 37 of the Federal Rules of Criminal Procedure states:

(a) Relief Pending Appeal.

If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer

---

[10] Malik Derry's convictions for conspiring to distribute heroin and on the so-called "phone counts" are not the subject of this motion. Rather, the Rule 37 motion concerns only his conviction on Count Ten of the Superseding Indictment which charged a violation of 18 U.S.C. § 924(c).

considering the motion; (2) deny the motion; or (3)
state either that it would grant the motion if the
court of appeals remands for that purpose or that the
motion raises a substantial issue.

## IV.

## THE EVIDENCE AT TRIAL

The Federal Bureau of Investigation opened a criminal
investigation in approximately October 2010 focusing on violence
and heroin trafficking in the Stanley Holmes Village public
housing development in Atlantic City, New Jersey. Based upon
their investigation, the United States concluded that a drug
organization, which the Government called the DDTO, had a fierce
grip on Stanley Holmes Village and the nearby area, flooding the
neighborhood with heroin and using violence to maintain
exclusive control over its territory. The indictments,
prosecution, and trial described above followed.

At the heart of Malik Derry's motion is the argument that
the undisclosed 302s would have been of assistance to him at
trial in undermining the Government's theory that James was
killed in furtherance of the DDTO drug conspiracy. To put that
argument in context, it would be helpful to summarize the
evidence produced at trial regarding the DDTO and the Derry
brothers' involvement in the overall conspiracy.

## A. **The DDTO Was a Violent Drug Trafficking Conspiracy**

The evidence at trial showed that the DDTO was a violent drug organization.[11] Malik Derry was one of approximately two dozen members of this gang, although any number of different people came in and out of the conspiracy over time. They referred to themselves as "Dirty Block" or "Crime Fam" and by other names and most lived in and around Stanley Holmes Village. They distributed a large amount of heroin sourced largely from

---

[11] Malik Derry does not appear to contest the violent nature of the DDTO. As set forth below, he chronicles in his own submissions to the Court the DDTO's acts of violence to show that much of it occurred while he was in prison:

> 1. October 30, 2010. 1000 Brigatine Blvd. Anthony Rosario assault. 2. April 17, 2011. South Florida Ave. Anthony Rosario shot by Kevin Washington. Stipulation J-6 Bailey not in Atlantic City at this time and Stipulation J-4 Bailey not involved in this shooting. 3. July 13, 2011. 1514 Wabash Place. [Sedrick] Lindo shot. Case 1:14-cr-00050-NLH Document 833-1 Filed 08/28/15 Page 8 of 10 PageID: 32149 4. September 13, 2011. 300 N. New York Ave. Shooting at house (Tyquinn James inside). 5. November 19, 2011. Disston Apartments. Shameel [sic] Spencer shot Kevin Green. 6. December 13, 2011. 436 N. Virginia Ave. Shooting at house. 7. August 21, 2012. 3900 Ventnor Ave. Shamed Spencer shot. 8. August 21, 2012. 4306 N. Drive. Michael Hamilton shot. 9. October 13, 2012. Pennsylvania and Caspian Avenues. Back Maryland shooting. 10. December 24, 2012. Tropicana incident. 11. February 10, 2013. Tyquinn James homicide.

(Malik Derry Motion for Judgment of Acquittal or a New Trial, Docket No. 833-1 at 8-9.) (The Court has condensed the original list of events into paragraph form.)

Paterson, New Jersey over a period of years. In addition, they were involved in distribution of other types of drugs.

The wiretap evidence alone established that it was an organization of persons who used intimidation, fear, and violence to maintain exclusive control over their territory and to control the activities of their potential rivals. They used weapons to protect themselves, their turf, their drugs, their stash houses and their customers from their drug rivals.

Guns and violence were an integral part of the drug trafficking. Guns were used, stored, and shared by the persons in this conspiracy. When guns were needed or wanted, whether for an unfolding brawl discussed below, or when they were moving as a group or engaged in a risky transaction, they were able to retrieve or request them from stored locations known and available to others in the gang. Guns were bought and shared as the need arose. So, not only were guns used, but they were used collectively, which is evidence that the guns were a part of the conspiracy and used by the co-conspirators freely and for the intended purpose.

## B. Eight Shootings and Other Violence

The Government described at least eight drug-related shootings the evidence tied to "Derry and his violent drug gang." (Gov. Statement at Mykal Derry Sentencing Hearing, Hearing Tr., Jan. 7, 2016, Docket No. 854 at 88.) Beyond the

torturous assault of Anthony Rosario, who had the audacity to sell heroin within Derry territory sourced from a dealer other than Mykal Derry, the specific instances of violence involving the DDTO included but were not limited to: (1) shootings with rival drug groups including the Trevin Allen gang; (2) the shooting of Anthony Rosario resulting in his paralysis; (3) the brawl at a casino; (4) the killing of Derreck Mack by the police after he fled, armed, from a DDTO stash house; and (5) three shootings at James, the final one fatal.

### 1. *Territorial Rivalry Between the Derry and Allen Groups*

At one point in time, the Mykal Derry gang and the Trevin Allen gang both sold heroin in Stanley Holmes Village. Something happened to that relationship and as a result, Allen and his followers became the enemies of the DDTO and were banned, under penalty of death essentially, from selling drugs in Stanley Holmes Village and from even entering the Derry territory.  Both groups began to shoot at each other.  This bitter feud between rival drug gangs forms the backdrop of the story relevant to this motion, that Malik Derry shot Tyquinn James, a member of the Allen gang.

### 2. *Anthony Rosario Shot and Paralyzed*

Kareem Young, a Government cooperator, testified that Anthony Rosario was kidnapped and brutally assaulted by Mykal Derry and others because he was selling heroin bought from

someone other than Mykal Derry. (Direct Examination of Kareem Young, Trial Tr. 4044-53, July 30, 2015, Docket No. 787.)  Young testified that Rosario gave a statement to authorities implicating Mykal Derry.[12] (Id. at 4051-52.)  According to Young, in retaliation Mykal Derry then ordered the shooting of Rosario which was carried out by Kevin "King Jaffee" Washington, who shot and paralyzed Rosario. (Id.)

### 3. *The Tropicana Incident*

On the night of December 23 and in the morning of December 24, 2012, there was a protracted brawl between associates of the DDTO and other Atlantic City drug dealers at the Tropicana Hotel.  It was captured on surveillance video.  The brawl was additional evidence that associates of the DDTO engaged in violence against rival drug dealers.

After the Tropicana incident, in a wiretapped phone call, Mykal Derry directed his enforcers, Kamal Allen, Kasan Hayes and Shaamel "Buck" Spencer to obtain and carry guns, especially in

---

[12] On October 25, 2011, Mykal Derry, along with Trevin Allen and Quaran Brown, pled guilty to aggravated assault in New Jersey Superior Court for the earlier brutal attack on Rosario. Derry was sentenced to 364 days in state custody. (Stipulation 10, Docket No. 803.)

relation to Yachor Napper and his associates, who were drug trafficking rivals.[13]

### 4. *The Derreck Mack Shooting Outside of a DDTO Trap House*

Derreck Mack, a teenage boy who was standing guard outside a DDTO trap house, was soon thereafter shot and killed by the police when he refused to drop his gun. At Mykal Derry's sentencing, the Government summarized this evidence including Mykal Derry's wiretapped conversation:

> Derreck Mack, when he was killed by the police after he refused to drop a .45 caliber semiautomatic handgun while he was running down the street on December the 17th, 2012, when his body was at the medical examiner or the morgue or whatever, No Limit heroin falls out of his pants. Two or three days earlier Mykal Derry is acquiring No Limit heroin from the suppliers in Paterson. And he had a loaded .45 caliber handgun on him that Mykal Derry and Kamal Allen and others discussed that, oh, yeah, he was strapped and he was talking crazy stuff like he was going to shoot it out with the police. He tells several people that, knowing that Derreck Mack - and he's standing on videotape outside with Terry Davis, another enforcer, and with Derreck Mack. They're not standing out there on - in December for their health. They're standing out there because they're enforcers guarding his trap house.

(Docket No. 854 at 12-13.)

## C. Evidence that Malik Derry was an Enforcer

Mykal Derry had determined his brother would be one of the DDTO enforcers. On October 8, 2012, according to an intercepted

---

[13] An urgent but impromptu call for the retrieval of guns for use by members of the DDTO the night of the Tropicana incident was unsuccessful.

phone call, Mykal Derry told Kareem Bailey, another DDTO enforcer, that his brother Malik would be "strapped" (street slang for armed) when Mykal put Malik on the DDTO payroll to sell heroin, which would occur when Malik was released from prison. (Gov. Exhibit 424) (See Direct Testimony of Special Agent Christopher Kopp, Trial Tr. 1047-50, July 8, 2015, Docket No. 752 (discussing the Exhibit).)

Several weeks later, after leaving prison, Malik Derry was reportedly involved in a dispute with one of the Derry associates, Saleem "Meatball" Reynolds. According to a wiretapped call, on October 23, 2012, Malik asked Mykal for a gun as he was angry with Reynolds. Another recorded call to Mykal Derry followed, this one from Jermaine Reynolds, the concerned brother of Saleem Reynolds. Mykal Derry reassured Reynolds and said "ratchets" (street slang for guns) would only be used on the "enemy" not on persons from Stanley Holmes Village.

The Government summarized the wiretapped evidence as follows:

> Two weeks later, on October 23, 2012, after he was back on the streets, Malik asked Mykal for "one of them things," (a gun), and claimed "I need it." GX477, Tr. 1276-77. Malik told Mykal that he was at the "Schoolhouse" public housing complex, and told Mykal "Just bring it." Tr. 1277.

> Twenty-five minutes later, another DDTO associate, Jermaine "Bam" Reynolds, complained to Mykal that

> Malik was threatening Reynolds' "brodies" (friends).
> GX478; Tr. 1293-94, 1296-98. According to Reynolds,
> Malik was "threatenin' n*ggers [daring them to] come
> out, and he ain't fightin', he's talkin' about gun
> work." Tr. 12989[sic]-99. Reynolds claimed that Malik
> was "buggin'" (crazy). Tr. 1298.
>
> Mykal assured Reynolds that he only distributed
> "ratchets" (guns) for use against "the enemy" (rival
> drug dealers), not people from "the (Stanley Holmes)
> village." Tr. 1298-99. Mykal assured Reynold that if
> he caught Malik using firearms against non enemies,
> "I'm f*ckin' him up, man, it's like that." Tr. 1299.

(Response Brief, Docket No. 913 at 32-33.)

Thus, according to the intercepted call, enforcers were not

to use the "ratchets" on persons from Stanley Homes Village, but

rather only on the "enemy" which this Court understood from the

evidence to mean the guns were only to be used on rival drug

gangs.

Further wiretap evidence that Malik Derry was an enforcer

included telephone calls and text messages between Kimberly

Spellman and Mykal Derry soon after the murder of Tyquinn James.

In those communications between Spellman and Mykal, Spellman

said Malik Derry did not need to go on an anticipated trip to

the shooting range to sharpen his skills. According to the

communication, Mykal Derry agreed and laughed.

The use of the guns at the shooting range, in light of the

conversations that occurred after the shooting of Tyquinn James,

suggests to this Court that those shooting range visits were

intended for enforcers to practice for the purposes of being

adept, comfortable, and experienced in using those weapons to protect their drug trafficking operations. These calls and text messages are evidence that Malik Derry was one of the enforcers and was expected to practice, along with the other enforcers, at the shooting range.

Moreover, we think it telling that Shaamel Spencer, who the evidence established was the main enforcer for the DDTO, and who was involved in the first two attempts to kill James, was the first person that Mykal Derry called after Malik Derry shot James. Mykal tells Spencer without any elaboration or explanation necessary, and with chilling coldness, that his brother had just killed James, a task Spencer had attempted twice.

Thus, the evidence at trial proved that Malik Derry was envisioned to be and became an enforcer. He was to be "strapped" upon return from prison. He sought a weapon to escalate a dispute with someone who was an associate and was told those weapons are just for the enemy. However, he was given a weapon when shooting someone was within the scope and responsibility of being an enforcer.[14]

---

[14] Malik Derry challenges the conclusion that he was an enforcer noting the limited evidence of his actual possession of a weapon. (Docket No. 914 at 10-13.) He notes that in the "Meatball incident" he is asking his brother for a gun. Defendant argues that if he were an enforcer and strapped the first day home from prison, he would not need to ask for a gun.

**D. The Evidence that Malik Derry Murdered Tyquinn James**

### 1. *Mykal versus Malik as the Shooter*

As we noted *supra*, Mykal Derry took the stand at trial and testified that he shot James after a dispute concerning the affections of a woman. All the other evidence in the case established, however, and without meaningful doubt, that Malik, not Mykal, was the shooter. We agree with the Government's summary of that evidence:

> The wiretap calls and text messages both before and after the shooting of James, the surveillance video showing an individual on a bicycle matching Malik Derry's height and physique, but inconsistent with Mykal Derry's shorter and stockier stature, and the physical evidence recovered, including the murder weapon and the bike used by the shooter, unequivocally establish that Malik Derry shot and killed James, and that Mykal Derry ordered the killing. That evidence also showed that Mykal Derry provided the murder weapon to Malik Derry before the shooting and stored the murder weapon in his residence at 727 Green Street (that he shared with his girlfriend Kimberly Spellman) after the killing. See PSR, paragraphs 171-188, Government Exhibits 703a, 706a, 707a, 710a, 715a, 721, 5018a, 7009 (search photographs of 307 MLK Boulevard), 7008 (search photographs of 727 Green Street), and the

---

However, this ignores the common method in which guns were used by the DDTO. Trial testimony established that DDTO associates did not always carry guns as that invited police interaction. Rather, guns were routinely stored in stash houses and available on an as-needed basis. A jailhouse recorded call illustrates this point. Mykal Derry reportedly declined to attend a truce meeting with James who was being shot at by Derry associates. Derry said he had a gun and did not want to go to the restaurant which was frequented by police. (Atlantic City Jail Call between Mykal Derry and Christian Blackman, Gov. Exhibit 5004) (See Direct Examination of Special Agent Christopher Kopp, Trial Tr. at 882, July 8, 2015, Docket No. 752 (discussing the call).)

Trial Testimony of Kareem Young, Special Agent
Christopher Kopp, and Special Agent David McNamara.

(Letter Brief, United States Response to <u>Brady</u> Motion, Docket
No. 880 at 11-12 (footnote and italics omitted).)

The Government also accurately summarized incriminating
telephone calls and text messages that establish that Malik
Derry was the shooter: "Less than thirty minutes after the
murder, Mykal called perhaps his most trusted lieutenant in the
DDTO, Shaamel Spencer, and told him that "Lik just splashed
T.Y., you heard? . . . Yeah, that n*gga's gone." (Docket No. 913
at 29 (quoting Gov. Exhibit 707).)  And further:

A few hours after the murder, Mykal and Kim Spellman,
another of Mykal's trusted confidants, exchanged text
messages. GX721; Tr. 2161.  After Spellman texted
"first homicide of da year, head shot," id., Mykal
replied "he gud, he acting like its nothn ctfa
("cracking the f*ck up"), GX721; Tr. 2161-62.  Mykal
then stated, "this n*gga iz a tru derry." Tr. 2162.
Mykal's reference to a third person ("he") who was a
"tru derry" and was "acting like its nothn" ineffably
points the finger at Malik as the shooter.

The following day, Spellman told Mykal in a series of
text messages and telephone calls that, unlike other
DDTO associates, Malik did not need to go to the
shooting range to sharpen his skills. Derry agreed and
laughed.  GX721, GX722; Tr. 2161-66. That exchange
meant that Mykal must have told Spellman that Malik
had proven himself to be an accomplished marksman and
"a true Derry," Tr. 5595, having shot James in the
head while riding a bicycle, just as the security
video showed.

(Docket No. 913 at 30-31.)

In one telephone call, Malik expressed his concern that the discovery of the murder weapon in Mykal Derry's apartment would lead to his conviction and lengthy incarceration:

> [There was] a call between Malik Derry and Ambrin Qureshi on February 14, 2013 (recorded by the Atlantic County Jail) wherein Qureshi informs Malik Derry that the police found the joint (gun) at Kim Spellman's apartment.  Malik Derry responds by telling Qureshi: "It's over" and "now I'm going to get the roof to the max."  See Government Exs. 5018 and 5018A, Trial Testimony of Special Agent Christopher Kopp at pp. 2189-2197, See also PSR, paragraphs 171-183.

(Docket No. 880 at 11 n.8. (italics omitted).)

In sum, all of the evidence, with the exception of Mykal Derry's confession, establishes that Malik Derry was the shooter and killer of Tyquinn James.

### 2. *"Brandishing" Versus "Discharging" a Weapon*

An examination of the jury's verdict on the enhanced penalty sections of 18 U.S.C. § 924(c) reveals their assessment of who shot James.  Title 18, United States Code, Section 924(c) provides in part:

> **(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

**(i)** be sentenced to a term of imprisonment of not less than 5 years; **(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and **(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

Because the statute provides for enhanced mandatory consecutive sentences for a defendant who, in addition to using, carrying or possessing a firearm in furtherance of certain crimes, also "brandishe[s]" a firearm (seven years mandatory consecutive sentence) or "discharge[s]" a weapon (ten years mandatory consecutive sentence), the jury was given special interrogatories to meet the rule of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

The Verdict Sheet shows the jury found Malik Derry and Mykal Derry both guilty of: a) using, carrying or possessing a firearm (Juror Question #5) and b) discharging a firearm (Juror Question #7). However, while the jury also found Mykal Derry guilty of brandishing a firearm, the jury acquitted Malik Derry of the same charge (Juror Question #6) which begs the question of what evidence, or lack of evidence, the jury relied on in making that distinction.

During deliberations, the jury posed the following question after asking for and being allowed to review the video of the James murder in open court: "If a person is shot without first being intimidated, either verbally or by seeing the weapon in part or in whole, is it safe to say that the weapon was not brandished?" (Court Exhibit 8 (C-8), Docket No. 826 at 8.)

The Court responded in writing and reiterated its instruction on the meaning of "brandishing" and "discharging" a weapon:

> "[B]randish" means . . . to display all or part of the firearm, or . . . otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person. . . "[D]ischarge" the firearm means to fire the weapon, that is, to cause the projectile to be propelled from the firearm.

(Court Exhibit 8 (C-8), Docket No. 826 at 10.)

The surveillance video of the James murder shows that James never saw the murderer approach him and accordingly never saw or otherwise observed the handgun used to kill him. The use of a bicycle allowed the shooter to reach James quickly and quietly and, at an elevated level, shoot him at point blank range at the base of his skull. James's casual demeanor prior to being killed and his failure to react to the shot or the shooter, except to fall over dead, proves conclusively that James never

saw the man who killed him.  In short, while the killer of James certainly "discharged" his weapon, he never "brandished" it.

This is significant because while a great deal of evidence in the record shows that Mykal Derry directed the DDTO's enforcers to use their guns to shoot at and intimidate the DDTO's competitors, the only record evidence that Malik Derry ever personally discharged a weapon was the murder of James. Accordingly, while they were never asked directly that precise question, the jury's decision to convict Malik Derry of discharging a weapon in further of the operations of the DDTO but acquitting him of brandishing a weapon for that same purpose – especially after posing the question they did and reviewing the video of the James murder - is proof positive the jury determined that Malik shot and killed James.

In sum, after considering all the evidence, after carefully considering the Court's instruction on "brandishing" and "discharging," after viewing the video of the shooting a second time, the jury rejected Mykal Derry's confession as inconsistent with all the other evidence in the case.

## E. Evidence of a Pattern of Shooting at James, a Drug Rival

Perhaps the most compelling evidence that the James killing was in furtherance of the drug conspiracy is the trial evidence that the DDTO's enforcers twice before had tried, but failed, to murder James.

1. ***First Shooting at James***

   The first time Derry enforcers targeted James was in September 2011.  The record evidence is that Shaamel Spencer and Jermaine Reynolds, attempted to shoot James at the residence of Trevin Allen's mother.[15]  The Government summarized a September 14, 2011, Atlantic City jailhouse phone call between Mykal Derry and Christian Blackman who discussed the events leading up to the shooting:

> The conversation was recorded by jail officials. GX5004; Tr. 869-70.  During that call, Mykal described how a rival drug dealer, Sedrick Lindo, "tried to off [shoot]" Mykal after Lindo "rolled up on" Mykal while he was in "the Third" village of Stanley Holmes complex. Tr. 869-74.  Lindo "let one off [fired a shot] and ran." Tr. 880.
>
> Tyquinn James was associated with Lindo, and Mykal demanded that James pay Mykal $10,000 as reparations for Lindo's failed assassination attempt. Tr. 880-81. James claimed that he did not have the money. Tr. 881.
>
> Mykal then described how two DDTO enforcers, Shaamel "Buck" Spencer and Jermaine "Bam" Reynolds, tried to avenge the Lindo faction's attempted assassination of Mykal.  Reynolds and Spencer, while armed, chased James into the "crib" [residence] of Trevin "Kadaf" Allen's mother. Tr. 875, 877.  Fortunately for James, Reynolds had given Spencer "a blicky [gun] that didn't even work." Tr. 877-78.  Reynolds also had a dysfunctional gun. "Bam walked up on T.Y. [James], tried to let three [gunshots] go, that sh*t [the gun] didn't even go off." Tr. 879.

---

[15] There may have been others present.  For example, both Mykal Derry, in a recorded call to Christian Blackman, and Young (See Direct Examination of Kareem Young, Trial Tr. 4102, July 30, 2015, Docket No. 787) appear to place Mykal's other brother "Boo" at the scene of the shooting.

> Later, while James was "hiding" from the DDTO killers, he asked Mykal to meet him at an Atlantic City restaurant, apparently to resolve their dispute. Tr. 882. Mykal refused, explained that he was carrying a gun, and would not bring it to the restaurant that was frequented by the police. Tr. 882.

(Docket No. 913 at 38-39.)

As the Government noted at the sentencing of Mykal Derry, the record evidence corroborates Mykal Derry's description of the shooting:

> Mykal Derry talks to Christian Blackman, his former drug supplier, while Christian Blackman is in the Atlantic County Jail, of an attempt to kill Tyquinn James where he's with Kalim Selby, his half-brother who he was selling drugs with, with Shaamel Spencer, who is one of his enforcers, with Jermaine Reynolds, Bam, who is another one of his enforcers, and then he talks about the gun that they gave Shaamel Spencer, Buck, jammed, and my brother went bananas and whatever and there were shots fired, and the Government presents the physical evidence of shots fired at Tyquinn James, shows the pictures of that residence being struck with gunfire, with projectiles, establishes through a law enforcement officer that Tyquinn James was on the scene at the time and was uncooperative as an intended victim. His driver's license, Tyquinn James, was admitted, comes back to that residence, 300 New York Avenue, and the mother of Trevin Allen is the resident of that area.

(Docket No. 854 at 45.)

### 2. *Second Shooting at James*

The evidence shows that on November 19, 2011,[16] in the Disston Avenue Apartment building, Shaamel Spencer shot at James

---

[16] The record has contradictory dates, November 2011 and September 2011, as to when the shooting occurred.

but hit an associate, Kevin Green, in the face.  A police investigation of the shooting scene corroborated Young's testimony at trial about the shooting which the Government summarizes as follows:

> While hanging out in Brown's Park with Young and others, Spencer, completely unprovoked, jumped on a bicycle and chased James and Kevin Green, who had just ridden past the DDTO associates on another bicycle. Spencer chased them into a nearby apartment building and fired several bullets into the building.  Spencer later told Young that he was trying to shoot James, but accidentally hit Green. Tr. 4094-4100.

(Docket No. 913 at 39.)

### 3. *Third and Fatal Shooting of James*

At 7:09 p.m. on February 10, 2013, in a wiretapped call, Malik Derry spoke to his brother and told him to come to the Red Klotz, a liquor store near Stanley Holmes Village, because he had located "T.Y." (James) outside in front of the store, and Mykal should bring "that" and further that he was "dead serious." (Gov. Exhibit 703.)  After a few minutes, Malik Derry confirmed that James was by the Red Klotz liquor store.  Mykal directed Malik to "stay right there because that n*gger right in front of Red Klotz, you heard?" (Gov. Exhibit 705) (See Direct Examination of Special Agent Christopher Kopp, Trial Tr. 2101, July 16, 2015, Docket No. 769 (discussing the Exhibit).)  The surveillance video shows a few moments later a tall thin man riding a bicycle in front of the liquor store shoot and kill

James. (Gov. Exhibit 12011 A-B.)  As we previously described, within minutes, Derry told Spencer, a Derry enforcer, that Malik had killed James.

The fact that the DDTO enforcers shot at James two other times is powerful circumstantial evidence that Malik Derry's shooting of James was in furtherance of the drug trafficking conspiracy.  Mykal Derry, the head of the drug trafficking organization: (1) appointed Malik Derry to be an enforcer; (2) provided Malik Derry with the murder weapon from his residence and a DDTO stash house; (3) sang his brother's praises "this n*gga iz a tru derry"; and (4) minutes after the shooting, let his main enforcer Spencer know "Lik just splashed T.Y.," as if to brag that his little brother had accomplished something his main enforcer had failed to do.

This pattern of shooting at Tyquinn James by the enforcers of the DDTO Organization, under the circumstances in which people expressed their disbelief that James would be so bold as to be found within earshot of Stanley Holmes Village, establishes that this was an organizational beef[17] that turned

---

[17] The Government evidence included testimony of an expert witness from the Drug Enforcement Administration, Special Agent David McNamara, who testified that while he knew of no direct evidence that the James murder was drug-related, the overall evidence in the case, including the repeated attempts to kill James and other evidence of animosity between the competing gangs, was consistent with the violence that typically occurs between rival gangs. (Cross-examination of Special Agent David

on, and had a nexus to, the dangerous and competitive world of selling illicit drugs.

V.

**BRADY CLAIMS**

**The Failure to Disclose the Brown, Qureshi and Spence 302s**

As previously described, initially the Brown I 302 was the subject of Defendant's post-trial Brady motion.  Now, with the additional Government disclosures of similar materials,[18] the

---

McNamara, Trial Tr. 4417-24, 4433-34, Aug. 4, 2015, Docket No. 797.)

[18] The Government urges us to consider our earlier determination, that the Brown I 302 was not Brady material, to be the law of the case.  While this Opinion is consistent with the law of the case as set forth in our June 2016 and August 2016 Opinions, there are several reasons why we believe that we should not start from that premise.  First, we should have the ability to revisit our prior holdings when, as in this case, we are considering new evidence, e.g., the second Brown 302, and the Qureshi and Spence 302s.  Second, we deem it appropriate to reconsider our prior rulings where the legal standard to be applied is different.  Now, with multiple pieces of undisclosed materials, we are required by Third Circuit law to engage in a cumulative materiality analysis, see Dennis, 834 F.3d 263, 312-13 (3d Cir. 2016); Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013).  Before, with only the Brown I 302 to consider, this was neither required nor possible.  Moreover, under Third Circuit law, the law of the case doctrine "does not restrict a court's power but rather governs its exercise of discretion."  In re Pharmacy Benefit Managers Antitrust Litigation, 582 F.3d 432, 439 (3d Cir. 2009) (quoting Pub. Interest Research Group of NJ, Inc. v. Magnesium Elektron, 123 F.3d 111, 116 (3d Cir. 1997))(citations omitted).  While any court should be "loathe to [revisit its earlier rulings] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice" Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988), the law of the case doctrine allows for reconsidering decisions "where

33

Brown, Qureshi, and the Spence 302s are the subject of Defendant's indicative motion alleging Brady violations. In each instance, the alleged Brady violation stems from the witness's statement that they did not know the reason why the Derry brothers killed James. According to the defense, Qureshi's, Brown's, and Spence's lack of knowledge as to the motive for the James shooting, both individually and collectively, undermines, or if disclosed would have led to other evidence that would undermine, the Government's theory and the jury's finding that the shooting was in furtherance of a drug conspiracy.

## VI.

### THE RELEVANT LAW

### A. Supreme Court Law

In Brady v. Maryland, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request[19] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963); Banks v. Dretke, 540 U.S. 668, 691 (2004); Kyles v.

---

(1) new evidence is available[.]" Pharmacy Benefit, 582 F.3d at 439.

[19] Under the law, the defendant is no longer required to ask for Brady material. Strickler v. Green, 527 U.S. 263, 280 (1999) (citing United States v. Agurs, 427 U.S. 97, 107 (1976)).

_Whitley_, 514 U.S. 419, 432 (1995). As set out by the Supreme Court: "There are three components of a true _Brady_ violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." _Strickler v. Green_, 527 U.S. 263, 281-82 (1999).

As the Supreme Court recently explained, "[E]vidence is 'material' within the meaning of _Brady_ when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." _Turner v. United States_, 582 U.S. ___, ___, 137 S.Ct. 1885, 1893 (2017) (quoting _Cone v. Bell_, 556 U.S. 449, 469-70 (2009)). The Supreme Court previously said, "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" _Kyles v. Whitley_, 514 U.S. 419, 434 (1995)(quoting _Bagley_, 473 U.S. 667, 678 (1985)). It is "petitioner's burden [] to establish a reasonable _probability_ of a different result." _Strickler_, 527 U.S. 263, 291 (1999) (emphasis in original) (citing _Kyles_, 514 U.S. at 434).

## B. **Third Circuit Law**

In addition, the Third Circuit Court of Appeals instructs us to do both an individual materiality analysis and a cumulative materiality analysis when deciding whether undisclosed evidence is Brady material.  Our Circuit, quoting the Supreme Court in Kyles and Bagley said:

> A court must "evaluate the tendency and force of the undisclosed evidence item by item" to determine whether the evidence is material. Kyles, 514 U.S. at 436 n. 10, 115 S.Ct. 1555.  In addition, a court must "evaluate its cumulative effect for purposes of materiality separately." Id.  Individual items of suppressed evidence may not be material on their own, but may, in the aggregate, "undermine[] confidence in the outcome of the trial." Bagley, 473 U.S. at 678.

Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013).

## VII.

## ANALYSIS

## A. **The Prosecutorial Role in Our Criminal Justice System**

Our first consideration is the role of the United States in failing to disclose the 302s.  The prosecutors in the Derry trial, like all prosecutors, have a special role in the American criminal justice system.  Their "client" is the sovereign and the United States' interest in convictions is predicated upon truth, fairness and justice. See generally, Strickler, 527 U.S. at 281.

The Supreme Court hailed the importance of fairness in criminal trials and embraced an inscription on the walls of the Department of Justice:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.'

Brady, 373 U.S. at 87 (footnote omitted). The Supreme Court cautioned against an adversary system where the prosecutors, by suppressing evidence, become more "gladiatorial" than "truth-seeking":

> Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result.

Kyles, 514 U.S. at 439.

**B. Government Good Faith**

Malik Derry argues the Government engaged in a pattern of nondisclosure as to the three 302s. While Malik Derry does not allege intentional concealment, guile, prosecutorial misconduct or any sort of bad faith, the characterization of the nondisclosures as a "pattern" could hint of bad faith. We have

observed the parties during the entire trial process and to date have seen no evidence of prosecutorial bad faith or misconduct.

In our August 2016 bench opinion we concluded that the Government failure to disclose was inadvertent, as the Government represented to this Court. Regarding the Brown I 302 we said that it appeared to us that the Government endeavored to disclose its perception of the contents, that there appeared to have been a desire and intent to follow up, and for reasons that were not entirely clear to us, the actual disclosure of the 302, which was intended, never occurred, perhaps because of what we called then the "fog of trial."[20]

There are a number of reasons the failure to disclose all three 302s might have been inadvertent. As we previously described, this complex case, even when pared down, involved seventeen defendants, nearly a six week trial, thousands of hours of wiretaps, innumerable exhibits, voluminous discovery, and extensive witness testimony as reflected in thousands of pages of trial transcripts.

Of course, while the complexity of the case and the attendant volume of material might explain a Brady violation, it

---

[20] To its credit, the United States agreed at the June Hearing that it would have been preferable if the Brown I 302 had been disclosed in full. When asked whether in a better world or in a perfect world the 302 would have been turned over, the prosecutor responded: "Judge, I will absolutely concede this point." (Docket No. 878 at 43.)

would not excuse a Brady violation.  The Third Circuit has said,
"We refuse to allow [the Commonwealth] to evade its duty under
Brady based on failure to adequately search or maintain its own
files." Dennis v. Secretary, Pennsylvania Department of
Corrections, 834 F.3d 263, 289 (3d Cir. 2016).  Nonetheless, we
are convinced the failure to disclose the 302s was not
intentional.

## C. **The Conscientious Prosecutor**

We are also certain that if there were any Brady relevance
of the 302s, it might not have been apparent to the Government
prior to and even during the trial.  It is often difficult, for
example, to see the value of some evidence until the trial has
concluded. United States v. Agurs, 427 U.S. 97, 108 (1976).  As
Justice Marshall said in his dissenting opinion, "while the
general obligation to disclose exculpatory information no doubt
continues during the trial . . . even a conscientious prosecutor
will fail to appreciate the significance of some items of
information." Agurs, 427 U.S. at 117.  In this case, it is fair
to say the full import of an alternative motive for the James
murder might not have been apparent until Mykal Derry's surprise
confession that he killed James over a woman.

In addition, the United States demonstrated its good faith
after the Court forwarded Malik Derry's letter to Counsel.  Once
it became clear to the Government that the 302s were of interest

to the Defense, the Government searched its records and
disclosed more 302s and certainly did not then withhold the
contested evidence.[21]

### D. Open File Policy

In our August bench opinion, we spoke to the value of an
open file policy, while also noting it is not required by the
Constitution.[22]  We echoed the Supreme Court's guidance when we
said we hoped the Government would be as open as it could be

---

[21] We commend the Government for their post-trials efforts.
Nonetheless, as we have noted, the burden of properly disclosing
Brady information rests solely upon the prosecution, not upon
the defense.  The defense is not required to engage in hide and
seek as to favorable evidence.  "A rule thus declaring
prosecutor may hide, defendant must seek, is not tenable in a
system constitutionally bound to accord defendants due process."
Banks v. Dretke, 540 U.S. 668, 696 (2004)(internal quotation
marks omitted).  Nor is the defense required to engage in a
scavenger hunt for Brady evidence: "Our decisions lend no
support to the notion that defendants must scavenge for hints of
undisclosed Brady material when the prosecution represents that
all such material has been disclosed." Id. at 695.

[22] Prosecutors, including those in the Derry trial, are not
required by the Constitution to have an open file policy
although as the Supreme Court said, "such a policy might work
out in practice[.]" Kyles v. Whitley, 514 U.S. 419, 437 (1995).
A prudent prosecutor will disclose any evidence that is
favorable to the defendant. Turner v. United States, 582 U.S.
___, ___, 137 S.Ct. 1885, 1893 (2017).  The Kyles Court said,
"This means, naturally, that a prosecutor anxious about tacking
too close to the wind will disclose a favorable piece of
evidence." 514 U.S. at 439.  The Court added, "This is as it
should be." Id.

simply because closed files create issues where issues do not have to be created.[23] (Docket No. 893 at 24-25.)

Whatever the reason the United States did not turn over the 302s – the "fog of trial," the unforeseeable significance of the 302s, security concerns, or any kind of good faith inadvertence, the rule is unwavering - <u>Brady</u> material must be disclosed. Accordingly, our task ultimately is to examine the "character of the evidence, not the character of the prosecutor." <u>Agurs</u>, 427 U.S. 97, 110 (1976).

## E. <u>Favorability</u>

To prove a <u>Brady</u> violation, the defendant must show three elements: favorability, suppression, and materiality.  We turn first to the requirement that "the evidence 'must be favorable to the accused, either because it is exculpatory or because it

---

[23] In this case, the Government had legitimate concerns that the wholesale disclosure of Jencks Act materials and other witness statements might subject even non-cooperating witnesses to real harm by members of the DDTO.  Evidence of the violent nature of the gang and retribution against "snitches" was part of the Government's proofs.  It appears that even defendants who did not sign cooperation agreements were required to make proffers to the Government as part of their plea agreements and those proffers often disclosed information harmful to the interests of the defendants.  We urge the Government to utilize as often as possible, and as they did in this case, other methods to protect confidential information and witnesses while meeting their disclosure obligations, such as "attorney's eyes agreements," *in camera* submissions, warnings to defendants that witness intimidation will be prosecuted, relocation of witnesses, and other protection methods appropriate to the case.

is impeaching.'" Dennis, 834 F.3d at 284 (quoting Strickler, 527 U.S. at 281-82).

Defendant argues the testimony of the three rebuttal witnesses would have contradicted Young's testimony and therefore impeached[24] his credibility.[25] Accordingly, Defendant contends, the 924(c) verdict against Malik Derry would probably have been different, making the nondisclosure of the 302s a Brady violation. Deconstructed, this argument consists of these subparts: (1) Qureshi, Brown and Spence, each to some degree

---

[24] The favorability element of a Brady violation can be invoked for exculpatory or impeaching reasons. Strickler, 527 U.S. at 281-82. Malik Derry argues the evidence is impeaching and exculpatory. (Docket No. 911 at 14-15.) While Defendant characterizes his favorability argument in part as "impeaching," the Government re-characterizes Defendant's argument as "impeachment by contradiction" as it is the alleged contrast in testimony between Young and the statements of the other three witnesses that Defendant argues impeaches Young's credibility. (Docket No. 913 at 43.) We agree with the Government. This is not the ordinary use of the term "impeach" in the sense of a witness's prior inconsistent statement on a material point or evidence that goes to credibility in general, such as a prior conviction. See, e.g., Giglio v. United States, 405 U.S. 150 (1972). Ultimately, however, this is more semantics than substance. We consider Defendant's argument as to the possible implications of the statements in the 302s to be within the scope of a favorability analysis under Brady.

[25] Malik Derry argues that Young's status as an informer raises "serious questions of credibility." (Docket No. 911 at 15.) That informants have credibility issues at trial is generally true. However, in this trial, Young's criminal record and plea deal were fully disclosed to the jury which had the opportunity to observe his demeanor and judge his credibility while experienced litigators cross-examined him.

members of the larger conspiracy, did not know why the shooting

occurred; (2) the shooting was therefore, by inference not in

furtherance of a drug conspiracy; (3) Young testified the

shooting was in furtherance of a drug conspiracy; and (4) the

302 statements contradict Young's testimony, thereby impeaching

by contradiction his credibility, and making their suppression a

Brady violation.

1. **Young Testified That He Did Not Know The
   Origin of the DDTO/Trevin Allen Gang Conflict**

Kareem Young testified that he, as well as the other

members of the DDTO, understood that James, Sedrick Lindo, and

others were members of a rival gang, and as such were not

allowed near or in Stanley Holmes Village and would be shot or

beaten if they were found in the area. (Direct Examination of

Kareem Young, Trial Tr. 3951-52, July 30, 2015, Docket No. 787.)

Under both direct and cross-examination, Young testified several

times he did not know why the split between the two previously

cooperative gangs occurred or what triggered this "beef" between

the Trevin Allen gang, including James, and the DDTO.[26]

---

[26] More specifically, Young testified that before he went to
prison, the Trevin Allen and Mykal Derry gangs were "cool
together, selling drugs together," including in Stanley Holmes
Village. (Direct Examination of Kareem Young, Trial Tr. 3977,
July 30, 2015, Docket No. 787.)  The Derry and Allen
relationship changed while Young was in prison.  Under direct
examination by the Government, in response to the question of
"What had changed?" Young testified:

In one sense then, the relevant Qureshi, Brown and Spence statements are not inconsistent with Young's testimony in that they sought to merely convey the same thing Young testified to: they, like Young, did not know the precise reason for the split or "beef" between the Allen gang and the DDTO and from that why James was shot.

That having been said, even assuming that the statements are contradictory on some level and Young were questioned by counsel about Qureshi's, Brown's and Spence's lack of knowledge, it is difficult to speculate on what his answer might have been, and even more difficult to assume his answer would have been

---

A. That we stopped being cool with them and just started beefing.
Q. Okay. And do you know actually how that started?
A. No.
Q. Okay. Did it start - do you believe it started while you were in custody?
A. Yes.

(Id. at 3982.)

On cross examination, Young also testified "Yes" to the question, "You testified that you didn't know the origin of the beef — you had heard different things, but you didn't know really the origin or how the beef started between Trevin Allen's group and how they split off from Mykal Derry's group because you were in custody, correct?" (Cross-examination of Kareem Young, Trial Tr. 4248, Aug. 3, 2015.) Young was again asked whether once he returned from prison, were the Trevin Allen and the Mykal Derry group "beefing, shooting at each other, correct?" Young said, "Yes." (Id.)

helpful to the defense.[27]   (Direct Examination of Kareem Young, Trial Tr. 4095-96, July 30, 2015, Docket No. 787.)

## 2. **Lack of Knowledge by Other Members of the Conspiracy**

We are also unpersuaded by the heart of Malik Derry's argument that if Qureshi, Brown and Spence did not know why the shooting occurred it therefore follows, by inference, that the shooting was not in furtherance of the charged drug conspiracy. An examination of the full text of the relevant 302s fails to support that inference.

### a. **Qureshi 302s**

The FBI wrote in the Qureshi I 302, "Qureshi did not know why JAMES had been murdered."[28] (Docket No. 903-2.)  Malik Derry's argument is that Qureshi[29] was so close to Mykal and

---

[27] For example, a simple and likely truthful answer would have been: "No, I did not know that."  A slightly broader variant of the same answer might be: "I don't know what they don't know."

[28] The first 302 was from a February 19, 2014 interview of Ambrin Qureshi at the U.S. Attorney's Office under a proffer agreement. (Docket No. 903-2 at 1.)  The second 302 was from a September 14, 2016 post-trial interview. (Docket No. 903-1 at 1.)

[29] Ambrin Qureshi is a co-conspirator who pled guilty on August 27, 2014, to a one-count information charging her with knowingly and intentionally conspiring to distribute and possess heroin, in violation of 21 U.S.C §§ 841(a)(1) and (b)(1)(B) and § 846. (United States v. Qureshi, Crim. No. 14-489 (D.N.J.), (Docket No. 27).)  She was sentenced on October 20, 2016 to nine months in prison and four years of supervised release.  (Id., Docket No. 35.)

Malik she would have known if the shooting were related to the drug trafficking conspiracy. (Docket No. 911 at 9-10.) Specifically, Derry argues Qureshi had a "close association with Mykal and Malik Derry" and a "detailed knowledge about this drug-trafficking conspiracy, its members and its beefs." (Docket No. 911 at 9.) Defendant contends, "While Ms. Qureshi may not have had a large or even formal role in the Derry drug-trafficking conspiracy, there can be no doubt that a fair reading of the notes of this pretrial interview shows that she possesses an astonishingly detailed knowledge of the conspiracy's personnel and its motivations." (Id.)

Defendant's argument has some support in the record. For example, Qureshi knew about the shooting of Shamir Harper which "was in retaliation for Harper shooting somebody, and that Christian Blackman, aka B.G. killed Harper, and that Kalim Selby and Shakeem Young were also involved." (Docket No. 903 at 6-7.) Defendants argue: "Ambrin Qureshi is someone who would have been expected to know if Tyquinn James was killed in order to protect or to further the conspiracy's interests. Despite this, she cannot provide a conspiracy-related reason for the killing of Tyquinn James." (Docket No. 911 at 9-10.)

### i. *Sherlock Holmes ("The Dog That Does Not Bark")*

Malik Derry's argument regarding the Qureshi 302 is the same argument he previously made to this Court in his Brady

motion as to the Brown 302.  There he invoked the character of Sherlock Holmes to explain the theory of his defense:

> Indeed, her not knowing is like the dog that does not bark in the night in the Sherlock Holmes story "The Silver Blaze."  Arthur Conan Doyle, The Memoires of Sherlock Holmes, at p.1. Dover Publications; Reprint edition (2010).  In that story, it is the failure of the watchdog to bark that shows that the culprit must have been familiar to the dog.  Here, it is Ms. Brown's supposed ignorance of a drug-conspiracy motive that is material because she is, after all, a member of the Mykal drug-trafficking conspiracy.  And she is not just any member.  She is a co-defendant whose apartment was a hub for the drug-trafficking conspiracy that resulted in her personal encounters with many other members of the drug-trafficking conspiracy.  Her ignorance of the motive means that she, a particularly plugged-in member of the conspiracy, is unable to tie the killing of Tyquinn James to the activities of the conspiracy.

(Docket No. 873 at 14-15.)

Paraphrasing Malik Derry's argument, then as to Brown and now as to Qureshi: (1) Qureshi was a knowledgeable close associate or confidant of Malik and Mykal Derry; (2) such close associates or confidants would know if a shooting were drug related; (3) Qureshi did not know the shooting was drug related; and (4) therefore, the shooting was not drug related.

This argument hinges, however, on the false premise that Qureshi was a person "who would have been expected to know."[30]  A close examination of the 302 reveals that this inference is not

_____

[30] We note that Qureshi's "I don't know why" statement is not directly favorable on its face, in the sense of tending to prove the 924(c) "in furtherance" element.

logical.  Contrary to Defendant's explanation, the most powerful explanation of why Qureshi did not know why James was shot, and would not have been expected to know, comes from Qureshi herself.  In her post-trial 302, she said "[I]n the years that she knew Mykal Derry he never spoke to her about any shooting that he was involved in." (Docket No. 903-1 at 2.)  She also said she "never discussed Tyquinn James with Mykal Derry or Malik Derry." (Docket No. 903-1 at 1.)

It is quite simple.  Qureshi did not know about James because the Derrys did not confide in her.  True, Qureshi was privy to gossip about the conspiracy, its personnel, its business and its beefs.  However, by Qureshi's own admission, Mykal Derry did not inform her about his involvement in shootings and the Derrys did not discuss James with her.

We draw a sharp distinction between gossip and actual knowledge.  Gossip, like hearsay, is unreliable.  A fair reading of Qureshi's statements as a whole establishes that not "knowing" about Derry shootings was ordinary and expected for her.

Importantly, the Qureshi II 302[31] provides, "Qureshi was asked to confirm that Mykal Derry never informed her of any

---

[31] The Qureshi II 302 is post-trial and therefore not subject to <u>Brady</u> disclosure requirements.  Nonetheless, it provides some insight into her level of knowledge concerning the

shooting incident he was involved in, and Qureshi replied, 'Why, so they could kill me?'" (Docket No. 903-1 at 2.)[32]  Clearly, Qureshi conveyed that she neither expected nor hoped to know anything about Derry shootings.  And who would be a better judge about such expectations than Qureshi?  For Qureshi, such knowledge[33] was the equivalent of the sword of Damocles and like Damocles, she preferred not to have the sword looming overhead.

---

James shooting and whether her earlier statements could be considered favorable to the defense.

[32] We are reminded of a relevant quote from a modern adaptation of Doyle's Sherlock Holmes novel, <u>The Hound of the Baskervilles</u>:

> Sherlock Holmes: I never did ask, Dr. Frankland. What exactly is it that you do here?
>
> Dr. Frankland: Ah, Mr. Holmes, I would love to tell you, but then, of course, I'd have to kill you.
>
> [laughs]
>
> Sherlock Holmes: That would be tremendously ambitious of you.

Sherlock (TV Series), <u>http://www.imdb.com/title/tt1942613/quotes</u> (visited August 3, 2017).

[33] Qureshi's concerns were justified.  Mykal Derry had threatened Qureshi and her family.  Qureshi also knew that the DDTO used intimidation, threats, and violence against others. She had heard that Mykal Derry was involved in murders and was telling people to kill other people. (Qureshi I 302, Docket 903-2 at 2.)  Considering their threats, intimidation and violence, Qureshi thought it best not to trifle with the DDTO.  We are confident that her statement that she risked being killed if she knew too much was not only an accurate reflection of her intuition, but chillingly, the truth.

## ii. _Derry Risk Management_

Just as Qureshi clearly did not want the burden of this particular type of knowledge, so too did Malik and Mykal Derry not want to share highly inculpatory knowledge with her. This was in line with their overall strategy of managing risk. The record in this case is replete with the methods used by the DDTO to manage risk, practices common to criminal organizations of this size and purpose.

These methods included: (1) storing guns and drugs in secretive places; (2) carrying guns for protection or intimidation when necessary; (3) not selling drugs in other gang's territory; (4) talking on the phone cryptically and in code; (5) using police scanners; (6) watching for police officers; (7) positioning lookouts outside of trap houses; (8) moving trap house sites due to increased police activity (e.g. following the Derreck Mack shooting); (9) threatening, intimidating or killing drug rivals who trespassed into their territory or who threatened them or their drug operations; and (10) threatening witnesses in judicial proceedings.

Limiting knowledge on a "need to know" basis is consistent with the risk management practices of the DDTO. It explains why Mykal Derry likely did not confide in Qureshi about the shooting. The Derrys themselves defined their confidants by the confidences they shared. Mykal Derry told Spellman and Spencer

about the shooting; they were confidants.  He did not tell

Qureshi; she was not.  As Qureshi was not a Derry confidant, she

would not be expected to know about the James shooting.

This conclusion is consistent with all the other evidence

in the case.  As with Jodi Brown, Qureshi's role in the DDTO was

not sufficiently high to be privy to such information.  Qureshi

was one of a rotating band of women, at least one of them a drug

user and tester, who had the functionally important but highly

risky and compartmentalized role of allowing their apartments to

be used as storage sites for the conspiracy.  While it is true

that in some organizations risk equates with reward and is

evidence of a position high in the hierarchy, here the opposite

is true.  In an organization of this kind, the evidence shows,

the leaders of the group, e.g. Mykal Derry, shifted the highly

risky task of storing inventory and the deadly tools of the

trade to underlings as a way to minimize the leaders' own

exposure to detection and prosecution.

In sum, Qureshi was neither an organizer nor a leader.

There is no evidence that she was a confidant when it came to

the DDTO's use of violence.  She was not an enforcer or

otherwise expected to use a weapon.  She would not be expected

to know which rivals were targeted.  When viewed in light of the

302's actual contents, Qureshi's role in the conspiracy, and the

means, methods, and operations of the DDTO as a whole, the

Qureshi 302 was not impeaching, not exculpatory, not favorable, and not <u>Brady</u> evidence.

## b. **Brown 302s**

The FBI states in the Brown I 302, Brown[34] "did not know the reason James was murdered." (Brown I 302, Docket No. 903-3 at 5.)  Malik Derry's argument as to the Brown 302 is the same as to the Qureshi 302; that if the shooting of James were in furtherance of the conspiracy, then Brown would have known as she was in a position to know.  As we noted previously, the "not knowing" language, on its face, is not directly favorable because it neither tends to prove nor disprove the 924(c) in furtherance element.  Rather, Defendant's argument is based upon the inferential meaning of the 302 language, as we described above.

Here, Defendant reasserts his contention made in his original <u>Brady</u> motion that the Brown 302 was "exculpatory and material." (Docket No. 914 at 5, 10.)  He argues the Qureshi and Spence 302s corroborate the Brown I 302 and would have provided

---

[34] Jodi Brown pled guilty on March 27, 2014 pursuant to a plea agreement to a one count information charging her with "knowingly and intentionally conspiring to distribute 100 grams or more of a substance containing a detectible amount of heroin . . ." in violation of 21 U.S.C.§§ 841(a)(1) and (b)(1)(B) and § 846. (<u>United States v. Jodie Brown</u>, Crim. No. 14-162 (D.N.J.), Docket No. 22.)  On November 17, 2016, Brown was sentenced to time served plus four years of supervised release. (<u>Id.</u>, Docket No. 29.)

"cumulative weight to the ability of Defendants to impeach the credibility" of Young's testimony. (Docket No. 914 at 10.)

It is uncontroverted that at one point in time Brown's residence was "used as a trap house in which conspiracy members would gather to conduct business and relax." (Docket No. 914 at 7.) Defendant argues Brown had near-encyclopedic knowledge of the drug conspiracy. (Docket No. 914 at 7.) According to the Brown I 302, Mykal Derry came to her apartment every day at 5:30 a.m. to drop off heroin and other people would begin to come at 9:00 a.m. (Docket No. 903-3 at 3.) Members of the conspiracy would discuss shootings that had occurred and rivalries between residents of Stanley Holmes Village and other public housing projects. (Docket No. 903-3 at 7.) According to Malik Derry, she was able to identify 29 associates of the organization, 17 of whom were indicted. (Docket No. 873 at 5-6.)

Like Qureshi, Brown knew about the drug conspiracy; however, she did not know the details of the James murder. She did not know for certain the identity of the shooter, nor did she know why the shooting occurred. For many reasons, Brown would not have been expected to know why the shooting occurred.

Our observations regarding the DDTO's risk management practices and the likelihood that Qureshi would know the details of the James shooting apply with equal force to Brown. While Brown's home was a frequent gathering place for associates

earlier in the life of the conspiracy, the fact that Brown was privy to discussion and gossip among conspirators about drug activities, rivalries, even shootings, does not mean that the Derrys trusted her enough to include her in their confidence about shootings in which they personally participated.

Again, Mykal Derry told Spellman and Spencer, and not Brown, about the James shooting for a reason. As we noted in our August bench opinion, Brown's role in the organization was not sufficiently high for her to be privy to such information. She was neither an organizer nor a leader. She was not an enforcer and was not expected to use violence to further the objectives of the DDTO. She was not a close associate and not a confidant regarding the DDTO's use of violence and intimidation.

Brown's original 302 supports our conclusion that Mykal Derry did not confide in her about his shootings. According to the 302, Brown said she "had heard from several individuals that Mykal Derry had murdered Tyquinn James, but Brown felt that Mykal 'doesn't have the heart for it[.]'" (Docket No. 903-3 at 5.) It seems unlikely that Brown would think that Mykal Derry did not have "the heart for it" if he had told her about his past acts of violence. It does not appear, for example, that

Mykal Derry confided in her about shooting "Mizz" and ordering "hits."[35]

Defendant emphasizes how close Brown was to James, knowing him since they were "young children." (Docket No. 914 at 6.) Therefore, Defendant says James was not some unknown rival, and if he "had been marked for death by the Derry Group [it] would have resonated with Ms. Brown." (Id.)  It is true that Brown states in her first 302 that she knew James "from the time they were young children." (Docket No. 903-3 at 5.)  However, if as Defendant asserts, Brown's near-encyclopedic knowledge of the DDTO and her special connection to James, meant she would have known he "had been marked for death," we would expect she also would have known that Derry enforcers had targeted James in the Disston Avenue Apartment shooting.

We would also assume she would have known James had been targeted by Derry associates on New York Avenue.  One would search the 302 in vain for disclosure of such knowledge.[36]  If she did not know the DDTO had targeted James twice before, then why would she be expected to know about the third and final shooting?  The inference of Brown's knowledge does not hold up

---

[35] Young testified to these and other Derry violent acts.

[36] While the Brown I 302 references Brown being privy to discussions about shootings and rivalries in general, nothing in the 302 indicates she had any specific knowledge about the highly relevant prior James shootings. (Docket No. 903-3 at 7.)

in light of the actual level of discourse between Brown and the Derrys especially as it relates to James.

In any case, around the critical time of the James murder, Brown was considerably removed from the DDTO for a variety of reasons.  Her distance was due in part to the fact that the DDTO had packed up their stash of drugs and guns and left her home approximately a month or more prior to the James shooting as a reaction to the Mack shooting.  In addition, "At the time Mykal Derry ceased using Brown's residence, Brown had already begun drug detoxification and no longer needed to acquire drugs from Derry and therefore did not need to interact with him." (Brown II 302, Docket No. 903-4 at 1.)  In fact, she was in the hospital for about a month around the time of the shooting and for some weeks around the time of the arrest of the Derrys. (Docket 903-4 at 2.)

In her post-trial 302, Brown said she did "not really" have any conversations with Mykal Derry or Malik after the Mack shooting," except an occasional brief conversation with Malik about such things as where he was staying. (Docket 903-4 at 2.) She also said "she did not want 'them' following her to her new residence." (Id. at 1.)  Thus, fortuitously perhaps, Brown's connection with the DDTO was at best attenuated, or nearly non-existent, around the time of the February 10, 2013 James shooting.  For that reason as well – lacking the opportunity –

it is not likely the Derrys would have confided in her about the James shooting.

In sum, as we previously held, we remain convinced that the Brown I 302 was not impeaching, not exculpatory, not favorable, and not <u>Brady</u> evidence.

### c. **Spence 302**

Spence[37], like Brown and Quershi, also "advised that he knew JAMES but did not know why JAMES was killed" according to the FBI 302 from the November 2014 interview. (Spence 302, Docket No. 911-3 at 5.) Malik Derry repeats his argument that if the shooting of James were in furtherance of the conspiracy, then as Spence was in a position to know, he would have known Derry's motive. The fact that Spence did not know why James was shot, according to Malik Derry, is a reason to conclude there was no drug conspiracy nexus to the shooting. (Docket No. 911 at 18.) Also as before, Spence's statement is not directly exculpatory and only arguably inferential as to the 924(c) element of "in furtherance."

---

[37] Laquay Spence pled guilty on March 27, 2014 pursuant to a plea agreement to a one count information charging him with "knowingly and intentionally conspiring to distribute a substance containing a detectable amount of heroin . . . ," in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and § 846. (<u>United States v. Laquay Spence</u>, Crim. No. 14-161 (D.N.J.), Docket No. 27.) On July 3, 2014, Spence was sentenced to 40 months in prison and five years of supervised release. (<u>Id.</u>, Docket No. 31.)

Defendant accurately characterizes Spence as an independent drug dealer and a minor player in the Atlantic City drug trade. In a not-illogical twist to his contentions, Malik Derry argues that as an independent drug dealer, it was in Spence's interest to be familiar with the interplay of the rival drug groups.

Here, however, the Defendant's argument proves too much. From Spence's perspective, it would be dangerous to have the Derrys confide in him. The DDTO engaged in intimidation, violent assaults, and shootings. As Qureshi warned, with knowledge came risks. Moreover, Spence was only tangentially involved with the DDTO so our Qureshi and Brown analysis applies all the more to him. Spence was so far removed from the center of the Derry orbit, there was no reason for the DDTO to share any incriminating information with Spence. Such a disclosure would be all risk and no reward.

Not only was Spence not a confidant, he was an associate of the DDTO only in the sense of being a minor distributor and wholesale customer. Spence admitted he was "not very close" to Mykal Derry. (Docket No. 911-3 at 4.) Spence clearly was not a trusted confidant, as he was only a useful tool of the DDTO. Even if, as Defendant surmises, he wanted the knowledge of Derry shootings, we conclude the Derrys would not have confided in him as that would be anathema to their risk mitigation strategy. Beyond mere speculation, there is no rational reason why Spence

would be expected to know about the James murder.  His 302 is

not impeaching, not exculpatory, not favorable, and not <u>Brady</u>

material.

Thus, we conclude that Defendant's inference that Qureshi,

Brown and Spence would have known if the James murder were a

drug related shooting does not withstand scrutiny and is wholly

inconsistent with all the other evidence in the case.  Further,

we reject the strained logic that their lack of knowledge meant

the James shooting was not a drug conspiracy related shooting.

Defendant's argument that these 302s were favorable,

exculpatory, and provide a basis for impeaching Young's

testimony fails.[38]

**F. <u>Suppressed</u>**

The second element Defendant must show is that the 302s, or

the relevant information in them, were suppressed.  The Third

Circuit has said to prove a <u>Brady</u> violation the evidence "must

---

[38] Malik Derry argues the crime cannot be both a "crime of
opportunity" and "premeditated."  Under the unique facts of this
case, it was indeed both.  The shooting was a crime of
opportunity in the sense James's appearance in Derry territory
was unexpected.  It was also premeditated as years before the
Derry gang put a target on James's back, as seen by the prior
two shootings and the testimony of Kareem Young.  In addition,
it was premeditated in the sense that once Malik Derry spotted
James he formulated a plan of attack and executed it.  As we
described in our August 19, 2016 Opinion, Malik Derry was
stalking James, armed with a gun from Mykal Derry, and was "dead
serious" about carrying out his brother's long-standing and
open-ended order to murder James on sight.

have been suppressed by the State, either willfully or inadvertently." Dennis, 834 F.3d at 285 (quoting Strickler, 527 U.S. at 282). It is plain, and uncontested, that the Qureshi I[39] and Spence 302s were not disclosed until after trial. Accordingly, they were suppressed. The essence of the Brown I 302 as it relates to Defendant's Brady arguments was disclosed in the prosecutor's email summary during trial within the time frame in which it could have been used by the Defense. We stand by our earlier conclusion that it was, therefore, not suppressed.

## G. Materiality

The 302s were not favorable within the meaning of Brady. As the undisclosed evidence must be favorable, suppressed and material, we could end our analysis there. However, in the interest of completeness and in recognition of the importance of the issues at stake to both sides and to the fair administration of justice in general, we turn to the issue of materiality.[40]

---

[39] The nondisclosure of the Qureshi II 302 and the Brown II 302 are not at issue as they were post-trial interviews.

[40] The parties address in their briefs and to some extent at oral argument whether it is realistic to conclude that Brown, Quershi, and Spence would have testified, if called by the defense, consistent with their 302s. As the Government asked rhetorically, "Where are the affidavits?" There are many reasons why all three would have been reluctant to testify and would likely have invoked their Fifth Amendment rights not to testify. Defendants argue that Qureshi and Brown were high-ranking, knowledgeable, and integral members of a high volume,

1. **Materiality: Individual and Cumulative Analyses**

Here we consider whether in the absence of the 302s the

Defendant "received a fair trial, understood as a trial

_____

violent drug gang.  Brown and Qureshi's plea colloquies and plea
agreements suggest a more modest role and it is unlikely, still
facing sentencing, that they would have allowed themselves to be
probed on such matters for fear their testimony would have
increased their sentencing exposure.  Qureshi and Brown, who had
not been sentenced at the time of trial, could have triggered
guidelines enhancements or risked losing credit for acceptance
of responsibility, either in whole or in part, by testifying.
It seems quite obvious that their experienced attorneys would
have counseled against it.  Spence, the defense alleges, sold
drugs not only for the Derrys but other gangs as well.  It does
not appear likely that he would have taken the stand and readily
admit to such uncharged acts absent immunity.  However, these
barriers to testifying do not exclude this information from the
sphere of Brady material merely because it is unlikely to be
admitted as evidence at trial.  Our Circuit Court has made clear
that "[a]dmissibility is not a requirement under Brady[.]"
Dennis, 834 F.3d 263, 309 (3d Cir. 2016).  Inadmissible evidence
could still be Brady material if it leads to admissible evidence
or if the evidence is impeaching.  Johnson, 705 F.3d at 130.
Moreover, if the disclosure would have allowed the defense to
"attack the reliability of the investigation," the evidence
could be material. Dennis, 834 F.3d at 308 (quoting Kyles, 514
U.S. at 446).  Inadmissible evidence might have been Brady
material if disclosure "would have empowered the defense counsel
to pursue strategies and preparations he was otherwise
unequipped to pursue." Dennis, 834 F.3d at 308.  Accordingly, we
do not rely on the unlikelihood that Brown, Qureshi, and Spence
would have testified in determining no Brady violation occurred.
Rather, we determine that whether they testified or not, the
information in their respective 302s would not have changed the
result, changed the defense strategy, led to other admissible
evidence, or otherwise impacted the course of the Derry trial.
We note that the Defendants have known about the 302s for many
months and to date have not identified additional witnesses they
would have called.  Nor has the Defense indicated how its
pretrial strategy would have been different. See id. ("The
proper inquiry . . . was to consider whether disclosure . . .
would have impacted the course of trial[.]").

resulting in a verdict worthy of confidence." Johnson, 705 F.3d at 132 (quoting Kyles, 514 U.S. at 434). Consistent with Third Circuit precedent we examine the materiality of each suppressed 302 individually and then cumulatively.[41] In the view of that Court, "[t]his approach may seem laborious, but as the Supreme Court has observed, 'there is no other way.'" Johnson, 705 F.3d at 131 (citing Kyles, 514 U.S. at 436 n.10).

### a. **Individual Analysis: Qureshi I 302**

As we said previously, the Qureshi I 302 states Qureshi "did not know why JAMES had been murdered." We conclude that had the Qureshi 302 been disclosed, it would have had no impact upon the trial because Qureshi's "did not know" statement is, on its face, irrelevant to the 924(c) verdict. In addition, notwithstanding Defendant's argument, it has no inferential or hidden meaning. It neither helps to prove nor disprove the "in furtherance" element of the 924(c) verdict.

If Qureshi were to testify, the jury would see the flaws in Defendant's inference and importantly place the statement in the context of Qureshi's other statements, common sense, and the other evidence in the case. Assuming she testified consistently

---

[41] We note here that it is the jury's role, not our role, to assess the credibility of witnesses or to choose one version of a witness's testimony over another. Rather, our narrow focus is whether the version most favorable to the defense would have led to a different outcome at trial. See Dennis, 834 F.3d at 302.

with her second 302, she would state that Mykal Derry never told her about any of his shootings, including the James shooting. From this, the jury would conclude that it was ordinary for Qureshi not to know about Derry involvement in shootings. The jury would reject Defendant's Sherlock Holmes inference.

Next, we assume Qureshi would testify about her "Why, so they could kill me?" question. This would be powerful testimony contradicting the heart of Malik Derry's defense that she would have been expected to know. She neither expected nor hoped to know.

The jury would likely determine the Derrys did not want her to know. The jury would likely conclude that disclosing highly inculpatory evidence about shootings only to confidants was consistent with the DDTO's strategic risk management practices. They would hear and see from the wiretap evidence that Derry told Spellman and Spencer about the shootings. As we have noted, they were Derry confidants; Qureshi was not.

Even if Qureshi did not testify as we have assumed, we can discern no meaningful way the defense could have capitalized on or benefited from this disclosure. They have not described how this information would have allowed them to question the investigation, identify other witnesses, pursue other strategies, or make additional preparations. Dennis, 834 F.3d at 308. Their sole argument is that it would have assisted in

the cross-examination of Young, a use, as we explain elsewhere, which would not have changed the result of the trial.

In short, Defendant's Sherlock Holmes argument would have died a quick death.  There was no hidden meaning in not knowing why the shooting took place.  The disclosure of the Qureshi 302 would not have changed the trajectory of the trial in the slightest.  There was no reasonable probability that had the evidence been disclosed, the result of the trial would have been different. See Turner, 582 U.S. at___, 137 S.Ct. at 1893.  We conclude that the Qureshi I 302 was immaterial under Brady.

### b. Individual Analysis: Brown I 302

A similar analysis applies to the Brown 302.  Had the Brown 302 been disclosed, it would have had no impact upon the trial because Brown's "did not know" statement is irrelevant on its face to the 924(c) verdict.  It also has no hidden or inferential meaning.  It neither helps to prove nor disprove the "in furtherance" element of the crime.

Moreover, the jury would have assessed Brown's statement with the other evidence in the case.  Whether or not Brown subjectively feared knowing about the Derry shootings as Qureshi plainly did, the jury would have heard six weeks of testimony about DDTO illegal activities, threats, intimidation, a brutal assault, and shootings.  We believe the jury would conclude no reasonable person would want the burden of a Derry confidence

about their shootings.  More importantly, the jury would have heard the wiretap statements and reviewed the text messages establishing that Mykal Derry confided in Spellman and Spencer about the James shooting, but did not confide in Brown.

We believe the jury would conclude that consistent with risk management practices, the Derrys determined who were to be their confidants and who were not.  The jury would likely appreciate the distinction between gossip and knowledge and know that Brown did not have knowledge about Derry shootings.

As with the Qureshi, we can discern no meaningful way the defense could have capitalized on or benefited from Brown's statement.  They have not described how her statement would have been of use beyond the questioning of Young, a use we conclude would have been ineffective at best and at worse potentially harmful to their overall defense.

In sum, the "Brown-would-have-known" argument would have fallen of its own weight for the same reasons explained in the Qureshi analysis.  There is no reasonable probability that if the Brown I 302 had been disclosed, the verdict would have been different.  Pursuant to an individual analysis under <u>Brady</u>, the Brown I 302 was immaterial.

c. <u>**Individual Analysis: Spence 302**</u>

In a November 2014 interview with the FBI, Spence said he did not know why James was killed.  As with the other

statements, on its face, the 302 would be irrelevant to the 924(c) verdict.  The inference Defendant promotes would fail for the same reasons described in the Qureshi and Brown analyses although more so to Spence, who was at best a tangential member of the DDTO.  Given the remoteness of Spence's connection to the DDTO, the Defense would have carried an impossibly heavy burden trying to convince the jury that Spence would be expected to know the reason James was shot.

For these reasons, the disclosure of the Spence 302 would have no reasonable probability of having an impact upon this trial.  Pursuant to an individual <u>Brady</u> analysis, the Spence 302 was immaterial.

## 2. **Materiality: Cumulative Analysis**

In <u>Johnson</u>, the Third Circuit held the District Court must consider the cumulative effect of all of the evidence that was suppressed and favorable to a defendant. 705 F.3d at 129.  The Circuit held, "Even items of evidence that the District Court may not consider material on their own must still be considered as part of a cumulative materiality analysis." <u>Id.</u> at 131.

The Third Circuit observed that the "[c]umulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts almost invariably will be greater than any individual part." <u>Id.</u> (citing <u>Simmons v. Beard</u>, 590 F.3d 223, 237 (3d Cir. 2009).  Our Circuit Court

said, "The importance of cumulative prejudice cannot be overstated, as it stems from the inherent power held by the prosecution, which motivated <u>Brady</u>." <u>Dennis</u>, 834 F.3d at 312 (citing <u>Kyles</u>, 514 U.S. at 437).

### a. <u>Cumulative Materiality and a Fair Trial</u>

The test of cumulative materiality is the same for an individual assessment; that is, whether in the absence of the 302s evidence as a whole, Malik Derry received a "fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>See</u> <u>Johnson</u>, 705 F.3d at 132 (quoting <u>Kyles</u>, 514 U.S. at 434).

Compelling circumstantial evidence at trial established the nexus between the James shooting and the charged drug conspiracy. Against this compelling evidence, we consider the undisclosed 302s, cumulatively. Even when viewed cumulatively, the undisclosed statements in this case do not rise to a level of materiality. In <u>Turner</u>, the Supreme Court said, "Considering the withheld evidence 'in the context of the entire record,' however, we conclude that it is too little, too weak or too distant from the main evidentiary points to meet <u>Brady's</u> standards." <u>Turner</u>, 582 U.S. at ___, 137 S.Ct. at 1894 (quoting <u>Agurs</u>, 427 U.S. 97, 112 (1976)). In the instant case, even if we consider the withheld evidence altogether, its collective

impact does not even approach being "too little, too weak or too distant."

## b. Impeaching Young

Malik Derry argues: "The trial would have been vastly different if, after Mr. Young testified, Defendant could have called a parade of three rebuttal witnesses who, like Mr. Young were associated with the conspiracy, but who would have been able to challenge the Government's premise that the James shooting was related to the conspiracy, let alone in furtherance of the conspiracy." (Docket No. 911 at 16.)

### i. *Materiality: Cumulative and Corroborated Testimony*

Our Circuit has said, "Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for <u>Brady</u> purposes." <u>Johnson</u>, 705 F.3d at 129 (citing <u>Rocha v. Thaler</u>, 619 F.3d 387, 396-97 (5th Cir. 2010)).

As we have noted, Young testify that he did know precisely what triggered the Derry/Allen rivalry. To the extent Qureshi's, Brown's, and Spence's statements are consistent with that testimony they are merely cumulative. Also, to the extent Young testified that the DDTO had a "beef" with the Trevin Allen gang, and by extension, with Tyquinn James, that testimony is strongly corroborated by other evidence and is therefore

generally not material.  One example of this corroboration is the testimony of Detective Cornelius Kane of the Atlantic City Police Department as to the shooting at the Disston Avenue Apartments.

As we briefly discussed above, Young testified he was in Brown's Park with Jermaine "Bam" Reynolds and Spencer when James and Kevin Green rode by on a bicycle.  (Direct Examination of Kareem Young, Trial Tr. 4095-96, July 30, 2015, Docket No. 787.) At trial, Young said Reynolds looked up and said he could not believe "these n*ggas just rode by us." (Id. at 4096.)  Spencer bicycled after and followed them into the Disston Apartments. (Id. at 4097.)  Young testified that Spencer intended to shoot James, but accidentally shot Green in the face. (Id. at 4100.) Young testified that he knew of no reason for the shooting other than they were drug rivals, no longer allowed in Stanley Holmes Village and no longer permitted to sell drugs in the area. (Id. at 4101.)  Young said James was previously targeted at the home of Trevin Allen's mother by Jermaine Reynolds and Mykal Derry's other brother, "Boo." (Id. at 4101-02.)

Young's testimony was corroborated by Detective Kane's on many points.  For example, Detective Kane described a photograph taken at the scene: "The individual on the right is Kevin Green, and he was shot in the face, and you can see where he's holding his face, but in his right hand he's got a black semiautomatic

69

handgun." (Direct Examination of Detective Cornelius Kane, Trial Tr. 3173, July 27, 2015, Docket No. 782.) Detective Kane also said,

> We had found out that the target in my shooting, [shooting of Green by Spencer] which was Tyquinn James, had actually been shot at multiple times previously. And we actually had casings from the Disston Apartments shooting. The 9-millimeter casing that we recovered in the hallway actually matched the 9-millimeter casings from the New York Avenue shooting where Tyquinn was shot at before.

(Cross-examination of Detective Cornelius Kane, Trial Tr. 3188-89, July 27, 2015, Docket No. 782.)

Kane's testimony corroborates Young's testimony in these important ways: (1) in the fall of 2011, Green was shot at the Disston Avenue Apartments; (2) he was hit in the face; (3) the intended target was James; (4) Shaamel Spencer was the likely shooter; and (5) ballistic tests showed persons used this same gun to shoot at James at least twice. The account of the shooting was further corroborated by surveillance video from the Disston Avenue Apartments. (Id. at 3165-67.) Young's testimony was also corroborated throughout the trial including by the testimony of DEA Special Agent David McNamara about street level drug operations. (Testimony of DEA Special Agent David McNamara, Trial Tr. 4269-396, August 3, 2015, Docket No. 796, and Trial Tr. 4405-24, August 4, 2015, Docket No. 797.)

Therefore, we conclude that the 302s, taken together, are not material because, (1) they are cumulative of Young's testimony and (2) Young's testimony was strongly corroborated.

### ii. *Materiality: Relative Value*

The Supreme Court instructs: "We must examine the trial record, evaluat[e] the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner, 582 U.S. at____, 137 S.Ct. at 1893 (internal quotation marks and citation omitted).  The materiality analysis requires the Court to consider the alleged Constitutional error in light of all the evidence to determine whether it "put[s] the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.  Our Circuit echoed the Supreme Court when it said, "The materiality of Brady material depends almost entirely on the value of evidence relative to the other evidence mustered by the state." Johnson, 705 F.3d at 129 (quoting Rocha, 619 F.3d at 396).

Young testified that upon rejoining the Derry Organization after a stint in jail he was informed the Derrys were estranged from the Allen organization.  He learned the Allen group was banned from Stanley Holmes Village and he quoted Mykal Derry that any member of Allen's organization should be shot on sight.

71

According to Young, Mykal Derry said, "If we see him [James], we got to put him down [kill him]." (Direct Examination of Kareem Young, Trial Tr. 4073-74, July 30, 2015, Docket No. 787.)

Young further testified that the DDTO and the rival drug organizations, such as the Back Maryland group and the Trevin Allen group, would shoot at each other or beat each other up if they breached the other's territory. Shootings and assaults occurred to protect drugs and themselves, to enforce their territorial claims, to seek revenge for being shot at, and to intimidate and kill each other, all under the umbrella of making money and selling drugs.

While Young's testimony added color to the other evidence at trial and provided the back-story as to some of the drug rivalries, it was but one piece of a mosaic of evidence in this trial. Malik Derry's 924(c) conviction is supported by wiretap evidence, ballistic evidence, video surveillance and physical evidence. Upon consideration of the entire trial record, we are confident that any impeachment value of the suppressed 302s would not have affected the 924(c) verdict as to Malik Derry.

Just as the Supreme Court held in Turner, we conclude in this case, that the additional impeachment of Young, if it could be called that, would not have undermined confidence in the verdict against Malik Derry on Count Ten. See Turner, 582 U.S. at___, 137 S.Ct. at 1895 ("We of course do not suggest that

impeachment evidence is immaterial with respect to a witness who
has already been impeached with other evidence.  We conclude
only in the context of this trial, with respect to these
witnesses, the cumulative effect of the withheld evidence is
insufficient to undermine confidence in the jury's verdict[.]")
(quoting Smith v. Cain, 565 U.S. 73, 75-76 (2012))(internal
citation and quotation marks omitted); see also Dennis, 834 F.3d
at 304 (contrasting Dennis which relied primarily on impeachable
eyewitness testimony for guilt with Strickler in which
"extensive and varied" evidence strongly supported conviction).

### c. **Mykal Derry and the Operations of the DDTO**

Young's testimony, while important, just scratches the
surface of all the other evidence of the DDTO's possession and
use of firearms under the direction of Mykal Derry.  There is of
course the James murder itself.  A .380 caliber Beretta
semiautomatic handgun, confirmed through ballistic testing as
the murder weapon in the shooting of James, was located not long
after the homicide in a drop ceiling of Spellman's home at 727
Green Street, a home shared by Mykal Derry.

The evidence establishes that Mykal supplied the weapon to
Malik: (1) on February 10, 2013, Malik asked his brother Mykal
for a gun as he had spotted James, a drug rival not far from
Stanley Holmes; (2) soon thereafter, the gun made its way to
Malik; (3) Malik executed James; (4) Mykal discussed with

confidants Malik's shooting of James; and (5) the police recovered the confirmed murder weapon as described above.

Mykal Derry was more than an associate of the violent DDTO. He was at the helm.  According to Young, Mykal was the leader of the gang:

> Everybody on the street know who's the leader of Crime Fam.  Before I met Mykal Derry, Tay-moo, Griffin, Grouch and them was the leader.  That's who we was looking up to.  But once they even got locked up, Mykal Derry came home, he was the oldest of that, so we looked up to him and he took over.  He was the leader of the Crime Fam.  So that's who we looked at and we took orders from and we did things for, and we shot people for.  That's what we did, we sold drugs for.

(Cross-examination of Kareem Young, Trial Tr. 4253, Aug. 3, 2015, Docket No. 796.)

Moreover, under Mykal Derry's command, weapons and violence were woven into the cloth of the DDTO.  The DDTO had a defined territory - no drug rivals were permitted to sell heroin or other drugs nor even enter Derry territory, under penalty of robbery, assault or death.  For example, if rivals sold heroin in Brown's Park, a public park claimed by the DDTO, according to Young "they would be robbed, beat up, or shot." (Direct Examination of Kareem Young, Trial Tr. 3951, July 30, 2015, Docket No. 787.)  The DDTO used the firearms to intimidate other drug dealers, to control their territory, to seek revenge and for protection of themselves and their drugs.

Mykal Derry had armed lookouts standing guard outside trap houses. He employed enforcers, ready to shoot at rivals who entered Derry territory. He and his enforcers honed their skills at a shooting range. Under Derry's direction, guns were possessed and used collectively, in furtherance of the drug conspiracy. He decided who would be "strapped," when guns were to be used (to kill the enemy) and when guns were not to be used (to kill residents of Stanley Holmes Village).

He controlled stash houses where guns were stored. When guns were needed or wanted, they were available to associates. At trial, the Government introduced into evidence two dozen firearms confiscated from various members of the DDTO during the conspiracy between October of 2010 and March of 2013.

Mykal Derry's domination of the Derry Organization is seen in his October 23, 2012 call with Reynolds as to what he would do if his brother Malik violated the rules and used a gun on someone in the village: "I'm f*ckin' him up, man its like that." (Gov. Exhibit 478) (See Direct Examination of Special Agent Christopher Kopp, Trial Tr. 1299, July 9, 2015, Docket No. 753 (discussing the Exhibit).) His command and control, often involving guns, violence, or intimidation was evidenced by his call to arms following the Tropicana brawl with drug trafficking rivals, directing enforcers Kamal Allen, Kasan Hayes and Shaamel Spencer to retrieve and carry guns.

Mykal Derry's use of intimidation is further seen in a not so thinly veiled threat to Young, warning him not to testify. Young recounted at trial Mykal Derry's ominous warning that if Young cooperated and testified, Zay-moo, Tay-moo, Grouch, and Griffin, the former leaders of the drug gang, would be home when Young was finally released from prison: "He was telling me that whoever cooperate, they got to get on the stand, 'cause he going to trial, and they gonna have to go home eventually, and Zay-moo, Grouch, Griffin and Tay-moo and them are going to be home." (Direct Testimony of Kareem Young, Trial Tr. 4246-47, Aug. 3, 2015, Docket No. 796.) Mykal's warning was particularly alarming in light of the shooting and paralysis of Rosario for Rosario having given a statement against Mykal to the police.

As we have noted previously, the evidence also shows that the shooting of James in February of 2013 was just one of eight shootings attributed to the DDTO during the short time they were under investigation.[42] Not only did Mykal Derry reportedly put

---

[42] The drug related shootings were often retribution for a prior drug related shooting, other violence, or threats to the Mykal Derry-led DDTO. One example, according to Young, was the killing of Derry associate Nazir Allen who owed money to rival drug dealer Yachor Napper's supplier. Young said he believed Napper (on orders from his drug supplier) and Napper's cousin "Pretty" committed the murder. Nazir's brother Kamal Allen, then set out to avenge his younger brother's death. Sometime after that, a fight ensued at the Tropicana Casino between DDTO members Kareem Young, Terry Davis, Mykal Derry, Spencer and members of the Napper group. DDTO associates were instructed to obtain weapons and shoot Napper and Pretty on sight. (Direct

out a "hit" on a number of individuals, but Young testified

Mykal said he personally shot "Mizz." (Direct Examination of

Kareem Young, Trial Tr. 4060, July 30, 2015, Docket No. 787.)[43]

Our Brady analysis and conclusions as to Malik Derry,

including the favorability analysis and the materiality

analysis, apply therefore equally to Mykal Derry.  As we

explained above, the 302s were neither favorable nor material

evidence under Brady.  In sum, we conclude that the undisclosed

statements, if made available in time for trial, could not and

---

Examination of Kareem Young, Trial Tr. 3952-61, 4084, July 30, 2015, Docket No. 787.)  Mykal's wiretapped phone call corroborates Young's testimony.

    As we have discussed in more detail supra, other examples include: (1) the shooting of Anthony "Ant 50" Rosario because Rosario stopped buying heroin from Mykal Derry and testified against him, id. at 4045-46.); (2) the attempted killing of Mykal Derry by Sedrick Lindo and the resulting effort by the DDTO to kill Lindo, James, and other members of the Allen gang; and (3) Young's testimony that Mykal Derry and Spencer rode bikes past his house, he heard gun shots, after which Young was informed that Spencer had shot Lindo on New York Avenue. (Id. at 4064-69.)

    At trial, Mykal candidly described his desire to murder James and Lindo, as revenge for being shot at by Lindo.  (Cross-examination of Mykal Derry, Trial Tr. 5553, Aug. 11, 2015, Docket No. 816.)  In a recorded jail call Mykal said he was going "to get" [kill] both Lindo and James.  James was reportedly with Lindo at the time of the attempt on Mykal. (Id.)

    [43] Young testified Mykal told him that he had dressed up like a Muslim woman and shot a person named Mizz because the younger brother of a Trevin Allen associate, Shaheed Hamilton ("Heed Horn") had shot at "Buck", a DDTO enforcer.  Mizz was a Hamilton cousin. (Direct Examination of Kareem Young, Trial Tr. 4055-62, July 30, 2015, Docket No. 787.)

would not have been used in any way that undermines our

confidence in the verdict against Mykal Derry on Count Ten.[44]

Therefore, this Court concludes that the failure of the United

---

[44] In addition to direct culpability, the Government also asserted both aiding and abetting and Pinkerton liability, see Pinkerton v. United States, 328 U.S. 640 (1946), against both Malik and Mykal Derry for Count Ten. After having found both defendants guilty of the base offense under 18 U.S.C. § 924(c), the jury was instructed by the Verdict Sheet to skip the aiding and abetting interrogatories so that theory is not relevant here. (Verdict Sheet, Docket No. 827.) As for Pinkerton, we do not consider the assertion of that theory of liability to the jury to be relevant to our Brady inquiry for several reasons. First, the "in furtherance of" element must be proven by the Government regardless of whether it proves a defendant acted directly or is liable under Pinkerton for a co-conspirator's act. Second, we are confident the jury did not apply Pinkerton to Malik on Count Ten. As we note *supra*, pp. 25-28, the jury acquitted Malik of brandishing but convicted Mykal of the same conduct. The James killing did not involve brandishing. If the jury had applied Pinkerton, the jury could have convicted Malik for Mykal's others acts of brandishing (or other co-conspirator's acts of brandishing) but did not do so. Thus, it appears the jury based its finding on Count Ten as to Malik for his direct and personal role in the James killing and nothing else. This is consistent with the practical fact that so much of the Government's proofs with regard to Malik Derry on Count Ten focused on the killing of James. Lastly, although the Government does not make this argument, Pinkerton theory does not bar Mykal's joinder in his brother's motion. To be sure, the time period of Count Ten mirrors the time period of the conspiracy and many of the co-conspirators are named in Count Ten. However, we cannot say with any confidence what conduct the jury considered in convicting Mykal of brandishing. While it could not be the Red Klotz event, it could have been the Disston Apartments or New York Avenue attempts to kill James. Or it could have been any of the other acts of gun violence separate from the attacks on James. The earlier James shootings could implicate Defendant's Brady motion but none of the other events do. Accordingly, because the jury could have considered the earlier targeting of James in convicting Mykal of brandishing, we approve his joinder motion.

States to disclose the 302s was no more a <u>Brady</u> violation with respect to the § 924(c) verdict for Mykal Derry than it was for his brother Malik.

## VIII.

### CONCLUSION

To the extent the 302s were suppressed, the failure of the Government to disclose the Brown, Qureshi, and Spence 302s was not a <u>Brady</u> violation.  We are confident that under an individual analysis and a cumulative one, as it relates to both Mykal and Malik Derry, there is no reasonable probability that had the 302s been disclosed, the result of the proceedings would have been different.  Malik and Mykal Derry each received a fair trial resulting in verdicts on the § 924(c) Counts worthy of confidence.  Therefore, Malik Derry's and Mykal Derry's motion for an indicative ruling will be denied and an appropriate Order will be entered.


Date:  <u>September 15, 2017</u>          <u>s/ Noel L. Hillman</u>
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.